101 So.2d 892 (1958)
Rosalie G. WILSON, Appellant,
v.
L.F. ROONEY, Appellee.
No. 373.
District Court of Appeal of Florida. Second District.
April 2, 1958.
Rehearing Denied April 29, 1958.
*893 Melvin J. Richard, Miami Beach, for appellant.
J.A. Franklin, of Henderson, Franklin, Starnes & Holt, Fort Myers, for appellee.
SHANNON, Judge.
The appellant, plaintiff below, brought a suit in chancery against the appellee, defendant below. The plaintiff, in her bill, sought to have a house in the name of the defendant declared to be hers, accounting be made by the defendant for the approximate amount of $48,000, and a money decree be entered against the defendant for the living expenses of plaintiff during her normal life expectancy. To this bill, defendant filed an answer generally denying *894 the allegations in the complaint and, in some instances, explaining the various allegations in the complaint. He also filed counterclaim wherein he sought recovery for the use of the house by plaintiff. The evidence is voluminous and consisted of taking testimony before the trial court, taking depositions, and filing exhibits. By his final decree the Chancellor found that the house in question is the property of the defendant and that the plaintiff has no right, title or interest in same. The decree also found that the plaintiff is wrongfully withholding from the defendant the possession of the house and has wrongfully withheld possession from a certain date and that the use value of the premises occupied by the plaintiff is $350 a month. He also found that the furniture, which was sold to the defendant by the plaintiff by bill of sale is the property of the defendant. In conclusion the Chancellor found that the equities in this case are with the defendant and that the plaintiff is not entitled to any relief prayed for and further, that the defendant was entitled, on his counterclaim, to the sum of $3,500, as the use value on the house from a certain date and the further sum of $350 for each thirty-day period that the plaintiff continued to occupy the same. The Chancellor, by a separate order, taxes the costs against the plaintiff. Included in the order is an item of $173.25, representing the amount paid to a court reporter for taking the deposition of the plaintiff. From this decree, and the findings of the Chancellor, the plaintiff appeals.
The plaintiff sets out seven points in her brief and argues each one, but for the sake of clarity, as well as brevity, the points may be summarized into four, namely:
1. Whether the defendant had promised the plaintiff the property sought or had taken any steps to effectuate this.
2. Whether the defendant had proved their relationship was meretricious, and hence the Chancellor erred in granting the defendant's counterclaim.
3. Whether the Chancellor erred in denying the plaintiff's proffered evidence consisting of a wire recording of telephone conversations between the two parties, and
4. Whether the court erred in allowing an item of $173.25, costs, in taking plaintiff's deposition.
The plaintiff testified that she had been married four times, to the last husband twice, the last divorce being on June 18, 1954. She met the defendant in California in 1953 and, according to her own testimony, in March of 1954, she was living with the defendant as husband and wife, and he eventually brought her to Naples, Florida, and established her in his house. On the question of whose name the house was in, in connection with the deed that was alleged by the plaintiff to have been given to her by the defendant, we quote from the testimony of B.V. Booth, from whom this property was purchased:
"Q. In the presence there of Mrs. Wilson did Mr. Walker ask Mr. Rooney how the contract was to be prepared and how the deed was to be made? A. Well, for some reason  I can remember it very distinctly that Mr. Walker  I mean the thing was practically closed  said  I mean our discussions were through with regard to taxes and so forth  said to Mr. Rooney, he said, `In whose name is this to be  is the title to be made out or the deed rather', see? Well, I remember it distinctly, Mr. Rooney's answer. He said, `Definitely in my name.'
"Q. Was Mrs. Wilson present at that time? A. Yes, she was there and Mrs. Booth and Walker I think was all.
"Q. Did you have a contract prepared by your attorney thereafter covering the sale of the property? (Record 381)
"A. Yes, I think Ben Parks  .
"Q. I hand you a paper which has been identified as Defendant's exhibit *895 1 for identification and ask if you recognize that paper? A. This was the option agreement? Yes, I recognize it.
"Q. Was that signed by you and Mrs. Booth? A. That's right.
"Q. And by Mr. Rooney? A. Yes.
"Q. And who appears as witnesses there? A. Well, Mr. Walker and Mrs. Wilson and ."
Mrs. Wilson testified that she went to Tulsa, Oklahoma, in June of 1954, and the defendant gave her a deed to the home in Naples with an accompanying letter which provided that the deed would not be recorded in the lifetime of the defendant. She testified that she did not look at the deed, and eventually placed the same in a lockbox in Naples, where the instruments remained until she, according to her testimony, redelivered the same to the defendant for recordation. This issue was denied by the defendant, and his evidence showed, at the time the plaintiff testified that she obtained them from the bank's lockbox, the bank's records indicated the plaintiff had been into her box twice during the Fall of 1955, on the 28th day of October and December 5th. On October 28th, according to defendant's evidence, he arrived in Naples late in the afternoon and left there on November 27th and from the time he was in Naples, she did not enter her safety deposit box as she says, upon a joint visitation to the lockbox. There is some testimony corroborating the plaintiff, and there is some testimony corroborating the defendant in various details with regard to his giving her the deed and later, getting it back from her. Regardless, the house does not and never has stood in the name of the plaintiff. The Chancellor heard all of the witnesses and concluded that the plaintiff had failed to meet the burden of proof and held with the defendant.
Upon this issue then the appellant seeks to have this court substitute its opinion in lieu of the Chancellor's. As has been said many times by our Supreme Court, where the evidence is conflicting, it is the duty of the Chancellor to determine the credibility of the witnesses and the probative force of the evidence, and unless the appellant makes it clearly appear that substantial error was committed by the Chancellor, or that the evidence clearly shows his conclusions to be erroneous, the court should affirm the Chancellor. See Peterson v. Hancock, 146 Fla. 410, 1 So.2d 255, 256, where our court said:
"The evidence was conflicting and it was the duty of the Chancellor to determine the credibility of the witnesses and the probative force of the evidence. In such cases the decree will not be disturbed by the appellate court, unless the appellant makes it clearly to appear that substantial error was committed by the Chancellor in his conclusions, or that the evidence clearly shows them to be erroneous."
We have taken the home as an illustration of the various property rights which the plaintiff claims. We could, for instance, take the claim of the plaintiff for the sum of $48,000, wherein the plaintiff alleges "That to date plaintiff has expended from her own funds at the request of defendant, for his use and benefit, and upon his express promise to repay, the aggregate sum of Forty-Eight Thousand Dollars ($48,000.00)." The records show that from July 24th to March of 1956, the defendant deposited $48,000 for the use and benefit of the plaintiff and of this amount, approximately $14,000 was used on the improvement of the house and the balance for the personal use of the plaintiff and household expenses. In addition, the plaintiff sold the defendant her furniture that she brought from California for $25,000. Again, the Chancellor heard the witnesses and in his ruling, he was well within the doctrine of Peterson v. Hancock, supra. In other words, the plaintiff charges and the defendant denies.
*896 Plaintiff claims the defendant had promised to provide a home for and pay her, although no salary was ever agreed upon, various items which she is claiming, including living expenses for the rest of her life. The defendant's contention is that the plaintiff agreed to act as caretaker and house-keeper of the Naples property without a salary, but upon his, the defendant's, providing the servants and paying operating expenses of the house. The evidence upon these questions is, as we have stated, conflicting, and the Chancellor decided in favor of the defendant.
In connection with her second point, as to whether or not the Chancellor erred in granting the defendant's counterclaim by reason of the fact that the relationship between these two parties was meretricious, it will suffice to cite a few of the many cases dealing with this subject. From appellant's brief we quote from the Restatement of the Law of Contracts, Volume II, Section 589, at page 1098, which reads:
"A bargain in whole or in part for or in consideration of illicit sexual intercourse or of a promise thereof is illegal; but subject to this exception such intercourse between parties to a bargain previously or subsequently formed does not invalidate it.
"Illustrations: * * *
"6. A employs B as a domestic servant. Subsequently A seduces B and continues to have sexual intercourse with her. The employment is not thereby rendered illegal, and B can recover wages."
In the Florida case of Schupler v. Eastern Mortgage Company, 1948, 160 Fla. 72, 33 So.2d 586, 590, the court says:
"In equity, maxims governing the action of the chancellor are that `a court of equity ought to do justice completely, and not by halves' and that `equity will not enter a partial or incomplete decree.' `The rule is that equity will not enter a partial or incomplete decree. Having taken cognizance of a cause for any purpose, a court of equity will ordinarily retain jurisdiction for all purposes, decide all issues which are involved by the subject matter of the dispute between the litigants; award relief which is complete and finally disposes of the litigation * * *.'"
While the doctrine of "unclean hands" is applicable in certain situations where they are voluntarily seeking further relief, these cases are easily distinguishable from the present case. As stated in 30 C.J.S. Equity § 98 as follows:
"* * * Where equity has assumed to act, it must do complete justice regardless of whether the litigants originally came into court with clean hands."
Irrespective of the fact that before final decree in this case the Chancellor had written to the attorneys representing various parties: "I find the relationship between the parties was meretricious at its inception and there is no evidence of the cessation of such relationship. Accordingly I find for the Defendant;". In his final decree the Chancellor found that the equities of the case were with the defendant and, specifically, found that the plaintiff had no title to, or right of possession to the premises, and had no title to, or right of possession to the furniture. As we have seen, when equity once takes jurisdiction of the cause, it will retain the same for all purposes to give adequate relief to the parties. We can go even a step further in this case, and look at the Chancellor's decree, wherein he finds specifically for the defendant, irrespective of what he terms a meretricious relationship.
The plaintiff has assigned as error, and makes it a point in her brief that the Chancellor erred in suppressing evidence consisting of telephone conversation between the two parties taken on a wire *897 recorder. If the wire recording were of telephone conversations between the plaintiff and the defendant offered in evidence with the proper degree of authenticity, of course he should have allowed it. In the instant case when the attorneys for the plaintiff offered the same in evidence the Chancellor directed that the spool of recording be given to the court reporter for safekeeping and took the question under advisement. At this point the plaintiff rested her case and at a subsequent hearing, the Chancellor announced that he would sustain objections to the admission, stating: "My ruling is made on the basis that the wire recording was not in its original state." Attorneys for the plaintiff then put the plaintiff on the stand "in rebuttal". The defendant's attorneys objected on the grounds that the defendant had returned to Oklahoma and was not present to rebut anything that might be brought up. The Chancellor denied the defendant's objections, and the plaintiff then testified that what she had offered previously was an edited copy made up from the original, and at that time the attorney for plaintiff produced another wire recording which he stated was the original. The Chancellor then refused such proffer. The proffer, in part, was as follows:
"Mrs. Wilson: You told me you wouldn't do that, though. Down in Florida you said `God damn it, I made up my mind that it's going to be in ____."
Leaving aside the question of immateriality, both appellant and appellee have quoted, although from different portions, excerpts from an article by Edward C. Conrad from The Virginia Law Review, Volume XL, 1954, portions of which appear in Volume I of Modern Trial Evidence, at pages 605 through 612. On the subject of "edited and altered recording", the writer says:
"This part of the discussion will assume a conscious editing or alteration of the wire or tape recording. One of the inherent weaknesses of this type of recording instrument is the ease with which alterations may be made, either intentionally or by mistake. An inexperienced operator may unconsciously erase part of a recording while only attempting to play back the wire or tape. An unscrupulous technician may magnetically erase parts of a recording and cleverly insert new material in the place of the missing parts. Magnetic tape may be edited at will. That courts are cognizant of this fact is illustrated by a Pennsylvania case which points out how a skillful operator may eliminate unfavorable testimony by blurring out part of the conversation with the volume control and later picking it up again. But any recording device may be manipulated in such a manner as not to take down all that is said, and any record once inscribed might be tampered with. But the latter happening can surely be detected, and it is easy to guard against the former. In the final analysis the problem will then resolve itself into a question of the credibility or integrity of the operator or technician. In this case the tape or wire recorder does not speak for itself.
* * * * * *
"As a condition of admissibility it should be demonstrated that the tape or wire recording has not been altered in any manner."
On the subject of admissibility of the wire recording of a confession, the Louisiana Court in State v. Alleman, 1950, 218 La. 821, 51 So.2d 83, 84 said in part:
"Whether a wire recording of a confession should be excluded on ground of possible fraud or substitution is a question for the trial judge in each particular case."
The plaintiff had offered what purported to be an original in evidence in the first instance. It turned out that this was but a copy and it was edited. Then, at a later *898 date, she offered another one that she said was the original. The Chancellor overruled her proffer. The two offerings made by the plaintiff were dubious to the Chancellor when, from the record, the authenticity and circumstances were highly suspicious, and the recordings were made by the plaintiff herself. No complete conversations with the defendant were ever recorded and, to say the least, the very materiality of it was extremely dubious.
In this particular case the Chancellor had all the facts in connection with the wire recording, including the question of whether or not it was a valid recordation, whether it was edited or not, and finally, whether it was immaterial or not. He used his discretion in not admitting it and in doing this, we cannot see he was in error.
In connection with the item of costs of $173.25, which was taxed against the plaintiff and covered the amount paid by the defendant to the court reporter, the appellant cites two cases: Dorner v. Red Top Cab & Baggage Co., 160 Fla. 882, 37 So.2d 160 and Loftin v. Anderson, Fla. 1953, 66 So.2d 470. The appellee cites Section 58.13, Fla. Stat. 1955, F.S.A., which provides:
"The court may in its discretion allow as taxable costs in a civil action expense of the court reporter for per diem, transcribing proceedings of the court and depositions."
The section of the statutes, which was passed in 1955, was subsequent to the two cases that the appellant cites. From the transcript we are unable to determine when the court reporter arrived and whether it was necessary for him to spend a night in Fort Myers or not. We are committed to the doctrine that nothing is more essential to proper administration of justice than keeping the costs of litigations in reasonable bounds, just as our Supreme Court stated in Loftin v. Anderson, supra, but at the same time, this item for costs was expended for the taking of deposition of the plaintiff, which deposition was used extensively at the trial in cross-examination. In addition, the trial court could more properly pass on this question than could this court, in the absence of anything in the record that advises us what the items were spent for, including where the reporter lived, how far he had to travel, whether it was necessary for him to spend the night at Fort Myers and the length of time it took him. Assuming that it was necessary to spend this amount for the deposition, it will then fall under Section 58.13, Fla. Stat. 1955, F.S.A.
The decree appealed from is affirmed.
Affirmed.
ALLEN, Acting Chief Judge, and SANDLER, HARRY N., Associate Judge, concur.