172 So.2d 511 (1965)
Donald S. GOMIEN, Appellant,
v.
STATE of Florida, Appellee.
No. 64-628.
District Court of Appeal of Florida. Third District.
February 26, 1965.
Rehearing Denied March 24, 1965.
Whitman & Knott, Miami, for appellant.
Earl Faircloth, Atty. Gen., and John Smith, Asst. Atty. Gen., for appellee.
Before TILLMAN PEARSON, HORTON and HENDRY, JJ.
HENDRY, Judge.
Appellant, a former police officer of the City of Miami, was tried in the Criminal *512 Court of Record for Dade County on a two count information charging him with extortion and accepting unauthorized compensation. The defendant entered a plea of not guilty to each of the charges and waived jury trial. Upon trial, he was found not guilty on the count charging extortion and guilty on the count charging him with accepting unauthorized compensation.[1] He was adjudged guilty and sentenced for a term of one year in the State Penitentiary. The defendant appeals from this final judgment and sentence.
The evidence, as shown by the record, reveals that the defendant and a fellow police officer of the City of Miami, while acting within the scope of their employment, entered a bar, known as the Barbaran Night Club on March 15, 1964 at approximately 5:10 A.M. The defendant arrested two patrons for being drunk and the manager, Sergio Niebla, for serving beer after hours. Niebla, upon being informed of their arrest, telephoned his employer, Kay Smith, and apprised him of the arrests. Smith promptly went to the Barbaran, where he found the officers and the parties they had placed under arrest. He discussed the matter with the officer who had accompanied the defendant on his mission. He also made a telephone call to a detective at the police station and discussed the arrest. Niebla testified that the defendant had asked him for $150, and that he had promised it to the defendant. After these conversations, the defendant and his fellow officer informed these people that they were not under arrest.
Nothing further was heard from the defendant until one week later when he went back alone to the Barbaran Club at between 2:00 and 2:30 A.M., dressed in his police uniform. He was asked by Niebla what he wanted. His answer was, "I come for my money." Niebla gave him One Hundred Dollars in Twenty Dollar bills which had been marked and given to him by two undercover investigating officers of the Police Department.
Further, in anticipation of the defendant's visit, the undercover police officers set up a tape recording machine in the premises, and arranged with Niebla to have the transmitter and microphone concealed on Niebla's person. He was instructed how to turn the transmitter on so as to record the conversation that was to take place at the time the money was paid over to the defendant. One Hundred Dollars in Twenty Dollar bills was given to the defendant outside the club only a few feet from where the recording machine and the undercover officers were concealed. The tape recording was made of the conversation between Niebla and the defendant. As soon as the defendant had received the money from Niebla, the undercover police officers asked him for it. The defendant put his hand in his pocket, got the money and surrendered it to the officers. The tape recording was preserved and used as evidence in the trial of the defendant. The following is a transcript of such recording of the conversation between the defendant and the witness, Niebla, which was admitted in evidence:
"MR. NIEBLA: `My boss give me the money to give this to you. I told you I give you the money Monday. I got *513 no hundred and fifty dollars. I got a hundred dollars. That's all.'
"SGT. GOMIEN: `A hundred dollars?'
"MR. NIEBLA: `A hundred dollars. I got it now. I give you one hundred dollars. I no have no more trouble with you, correct?'
"SGT. GOMIEN: `How about the Sergeant? He wants $150.'
"MR. NIEBLA: `How much want the Sergeant?'
"SGT. GOMIEN: `Right now he gets the whole thing. I don't get nothing. He is the boss, not me. If he gives me $25 I am lucky. Maybe he will, maybe he won't. I know that if you do, you get no more trouble.'
"MR. NIEBLA: `But I no have hundred and fifty dollars. I have hundred dollars. That's all. I don't know why I give the money to you.'
"SGT. GOMIEN: `So we don't press the charges, that's why. He was going to make the arrest. It's up to him.'
"MR. NIEBLA: `I give you one hundred dollars, all right? No more trouble with you and the Sergeant?'
"SGT. GOMIEN: `You'll have no trouble with me. He told me to come here. You know me. I never came here before, did I?'
"MR. NIEBLA: `Yes.'
"SGT. GOMIEN: `I never came here except to say "Hello".
"MR. NIEBLA: `Yes.'
"SGT. GOMIEN: `That night last week, he was out here. He said, "What goes on here?" I said, "I don't know. No trouble." He says, "Let's go inside."
I told him the same thing.'
"MR. NIEBLA: `It's okay.'
"SGT. GOMIEN: `Why don't you give him the hundred dollars and give him the fifty dollars later?'
"MR. NIEBLA: `If you leave me alone, I give you a hundred dollars. I can't give you more. I no have more money.'
"SGT. GOMIEN: `Give the fifty dollars later, next week, and the Sergeant won't be back.'
"MR. NIEBLA: `I no want no more trouble with you and the Sergeant.'
"SGT. GOMIEN: `You will have no trouble with me anyway, never did, right? You give me the hundred dollars. I'll tell him you will give the fifty dollars next week.'
"MR. NIEBLA: `Tell him I give you fifty dollars next week.'
"SGT. GOMIEN: `And a hundred dollars now.'
"MR. NIEBLA: `A hundred dollars now, and I don't want no more trouble with you and the Sergeant. I have my business, my job. I no do nothing. I have no trouble. I work in here every night. I give it to you. I no have the money.'
"SGT. GOMIEN: `I know that.'
"MR. NIEBLA: `Okay. I no want no trouble with you and the Sergeant.'
"SGT. GOMIEN: `Right. I'll see you next week. Don't let anybody see you do this. Come on outside.'
"MR. NIEBLA: `Twenty, forty, sixty, eighty, a hundred.'
"SGT. GOMIEN: `Whose car is this?'
"MR. NIEBLA: `Oh, this car is Mr. Kay. Okay, take the money.'

*514 "SGT. GOMIEN: `Who owns that car?'
"Mr. NIEBLA: `That car is customer.'
"SGT. GOMIEN: `You know him?'
"MR. NIEBLA: `Yes, I know him. He is a customer.'
"SGT. GOMIEN: `Okay.'
"MR. NIEBLA: `Okay. Next week I give him another fifty dollars.'
"SGT. GOMIEN: `Right.'
"MR. NIEBLA: `You come next week, okay?'
"SGT. GOMIEN: `Okay.'
"MR. NIEBLA: `No more trouble?'
"SGT. GOMIEN: `Okay.'
"MR. NIEBLA: `Okay.'"
Appellant asks reversal on two grounds. His first contention is that the trial court erred in admitting in evidence the tape recording. The second contention questions the sufficiency of the evidence to sustain an adjudication of guilty of the charge of accepting unauthorized compensation.
Appellant argues in support of his first contention that it was error to admit the tape recording in evidence because the state failed to lay a proper predicate for its admission.
The question of tape or other mechanical sound recording as admissible evidence and the extent of its probative value have never previously been squarely considered by the courts of this state. A discussion in regard thereto seems appropriate.
The Florida Supreme Court first recognized sound motion picture film as admissible evidence in Gulf Life Ins. Co. v. Stossel, 131 Fla. 127, 179 So. 163 (1938) where Justice Terrell stated:
" * * * [B]ut to be competent evidence, the films must be properly authenticated and shown to be a faithful representation of the subject, sound, movement, or other tangible or intangible thing which they purport to reproduce. When such a showing is made to the trial court, moving picture films should be admitted under the same rules as photographs."
The next occasion upon which this question was considered was in Padgett v. State, Fla. 1951, 53 So.2d 106. There, however, the court was not concerned with the general question of the admissibility of a sound recording, but treated this sound recording as an exhibit, and dealt with the substantive material contained in the recording and its use for impeachment purposes. The court did, however, go on to state:
"Even if it [recording] had been offered in proper order as rebuttal testimony for impeaching the testimony of defense counsel it would have been inadmissible as defense counsel had not testified regarding the recording." [Emphasis supplied.] 53 So.2d at 109.
The court evidently gave as an additional reason for failing to admit the recording into evidence, the failure to authenticate the recording and the failure to lay a proper predicate as required by Gulf Life Ins. Co. v. Stossel, supra.
The second district in Wilson v. Rooney, Fla.App. 1958, 101 So.2d 892, 897 made an off-hand reference to the admissibility of sound recordings:
"If the wire recording were of telephone conversations between the plaintiff and the defendant offered in evidence with the proper degree of authenticity, of course he should have allowed it."
*515 The result of these cases is that the sound recording is admissible in evidence,[2] provided that a satisfactory degree of authenticity has been achieved. These cases do not, however, offer any guidelines as to what is necessary in order to satisfy the requirement of authenticity. Accordingly, we must look to our sister jurisdictions for assistance.
The Federal Court of Appeals for the District of Columbia set out a guideline as to the necessary preliminary steps which must be shown in order to lay a proper basis for the admission of sound recordings. In Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956) when Judge Fahy said:
"Their [recordings] competency as evidence derives from their reliability as a means of arriving at the truth. Of course, there must be evidence introduced from which it can be inferred that the recordings are accurate. Lt. Thoman provided such evidence by testifying as to [1] the operation of the recording device, [2] his method of operating it, [3] the accuracy of the recordings, and [4] the identities of the persons speaking." 234 F.2d at 54.[3]
In our case, the record amply demonstrated that the requirements of Monroe, supra, were met. The witness, Niebla, testified that he was instructed in the use of the microphone, and all he was required to do was to turn a switch that started the recording. The actual operation of the recorder was under the control of a thoroughly capable and experienced operator who testified how he operated the equipment. The witness, Niebla, identified the person speaking, and that the recorder accurately recorded the conversation between them.
Appellant's further contention, that the recording should be wholly inadmissible because portions of the recording were unclear and indistinct is not well taken. It has been universally held that because portions of a recording are unintelligible is no basis for keeping the intelligible part out.[4] A partial incompleteness of a recording may be used by the defense as a factor to be considered by the jury when determining what value to place on the recording.[5]
Although the question of the trial judge reviewing a recording and editing it prior to presentation to the jury, does not come up in this case, this being a non jury trial, we feel it appropriate at this time to point out that the recognized better practice is for the trial judge to preview the recording and order stricken those portions which are irrelevant or prejudicial,[6] before the recording is presented to the jury.
The constitutional question of the tape recoring constituting an illegal search and seizure or a sort of entrapment has already been answered adverse to the appellant.[7] A strict judicial adherence to the requirements necessary for authentication; in addition to a judicial preview of the recording for the elimination of prejudicial and irrelevant matter, will afford the defendant the protection our Constitution guarantees him while at the same time making available a highly useful and reliable scientific means of presenting evidence. *516 Accordingly, the trial court properly admitted the recording into evidence.
Appellant's further contention that there was insufficient evidence to sustain the conviction is without merit, especially in view of the transcript of the recording set out above.
The judgment appealed is affirmed.
Affirmed.
TILLMAN PEARSON, Judge (concurring specially).
It is my view that for the recording to be admissible in evidence the voice of the defendant must be identifiable from the recording. See 1 Conrad, Modern Trial Evidence § 722 (1956). In the instant case the trial judge ruled that this had been done by circumstantial evidence. If this had not been done, I think the opinion in this case would be in conflict with Wilson v. Rooney, Fla.App. 1958, 101 So.2d 892.
NOTES
[1] "838.06 Unlawful for officers to accept unauthorized compensation for performance or nonperformance of duty. It is unlawful for any public officer, agent, servant or employee to request, solicit, exact or accept any reward, compensation, or other remuneration, other than those provided by law, from any person whatsoever for the past, present or future performance, nonperformance or violation of any act, rule or regulation that may be or may have been incumbent upon such public officer, agent, servant or employee to administer, respect, perform, execute or have executed; provided that nothing herein shall be construed so as to preclude a sheriff, deputy sheriff, constable, deputy constable, city marshal or policeman from accepting rewards or remuneration for services performed in apprehending any criminal."
[2] Accord. cases cited in Annot., 58 A.L.R. 2d 1024, 1029 (1958).
[3] Accord., Todisco v. United States, 298 F.2d 208 (9th Cir.1961).
[4] Cases cited in Annot., 58 A.L.R.2d 1024, 1037 (1958); Todisco v. United States, supra; People v. Feld, 305 N.Y. 322, 113 N.E.2d 440 (1953).
[5] Todisco v. United States, supra.
[6] id.; Grant v. State, Fla. 1965, 171 So.2d 361 (Not yet reported, opinion filed Jan. 8, 1965).
[7] Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).