PER CURIAM.
From judgments of conviction and sentences imposed against them for violation of the lottery laws of the State of Florida, defendants-appellants, Frank Brady and Willie Johnson, have instituted an appeal.
Although other questions are also raised, we are concerned primarily with a tape recording of a conversation between Lambert Phillips, a witness for the state, and one of the defendants, Brady, together with a purported transcript of the recorded conversation. The recording was admitted into evidence, while the transcript, although excluded as evidence, was permitted by the court to be used by each juror in the form of copies distributed among them to aid them in their understanding of the recording as it was being played. The conversation in question took place on the street outside a place known as “Frank’s Bar.” The recording was procured by means' of a battery powered electronic apparatus consisting of a microphone and antennae, strapped to the body and concealed be *122 neath the clothing of Phillips, and a receiver-transmitter and recording device located on a truck parked across the street from the bar to the front of which the two stood talking.
During the trial, the tape recording was offered into evidence by the state. Defendants objected, saying among other things that its contents were so inaudible and indistinct that the jury would be required to speculate as to what was said. In overruling the objections and admitting the tape recording into evidence, the court said:
“While a large part of this tape is inaudible and you do have to listen closely to understand any of the tape, if you do listen closely you can understand part of it. Part of it you can’t understand even if you listen closely. Now, if there were no other evidence of this conversation, I certainly would sustain your objection but in view of the fact that the witness Lambert Phillips has testified as to the conversation and what went on I’m inclined to overrule the objection.”
Their objection as to inaudibility and unintelligibility of the tape recording and asserted consequent unreliability of it is reiterated by defendants on the appeal. Allied with their position as to the claimed prejudicial effect of admission of it into evidence is their vigorous protest that harmful error was further committed by the court in authorizing at the instance of the state use of the purported transcript of the recorded conversation rejected as evidence, a copy of which was in the hands of each juror as the recording was being played.
The state argues that, although in spots the recording is inaudible and incoherent, it reflects to a great degree the entire matter discussed and that even the portions appearing inaudible concern a certain number and seem to establish that Brady was the “chief man or banker.” It is urged that the total evidence is ample to convict both defendants of the charges thrust against them.
The court reporter’s transcript of the tape recording as it was run before the jury follows:
“(Thereupon, the recording was played for the jury. The following is the portion the Court reporter could understand of the recording.) :
For two years I have been playing this thing and I didn’t get it back.—
I know, but you feel like doing it whether you do it or not. if there is—
64—
Every week.—
God damn thing.—
They ain’t telling -you a thing.—
Bring anything—
They don’t bring you before 2:0O o’clock.—
31, but that there on 32, that should have been by 31.—
I can’t — if he’s got that on 31.—
I don’t know where he goes.—
- — 31, but see — 32, 72 and 31 — shows you the mistake.
—32.—God damn race is run. I mean-you can’t do that.
It’s just like you — you can put yourself in my shoes.
—God damn numbers- — turn in four numbers. — when we don’t sell the stuff. What would you do, huh?
That’s what I’m talking about, see?
You would do the same thing I would.
—All right.
—all that stuff. — there is a way to do it.
—well, okay.”
*123 The transcript which was in the hands of the jurors [1] as the tape was being run had been prepared by officers of the law through repeated reruns or playbacks of the record *124 ing and the subsequent dictation of what was made of it into a dictaphone, whence it was reduced to typewriting by a stenographer in the prosecuting attorney's office. In moving for its admission into evidence, the state said, in response to a query of the court as to the purpose of the offer, that it was not being offered as primary evidence but to give the jury the opportunity “to compare the transcript with the record as the record is played and judge for themselves whether the transcript is an accurate reproduction of what is on the recording. The purpose of the offer is to assist the Court and the jury.” The trial judge sustained defendants’ objection as to the admission into evidence of the typewritten transcript, saying:
“Well, actually you haven’t — in offering this in evidence you haven’t offered it in such a way as to accomplish what you say the purpose for offering it in evidence is. If it’s received in evidence then it — what is written on that paper becomes facts which the jury may consider. I sustain the objection as to its being received in evidence.”
Then ensued the motion of the state that copies of the transcript be delivered to the court and jury for their assistance and understanding upon the playing of the tape recording. The court, granting the motion, admonished the jury as follows:
“Now, what is written on this piece of paper that you are permitted to have is not evidence and you will not consider anything from that paper as evidence in this case. Only what you hear from the recording itself is evidence and if you don’t hear anything that may be written on that paper, you are not to consider what is on the paper. You are to consider only what you hear. The paper — the contents of the paper are not evidence in this case for you to consider. It’s merely for your assistance in following the recording.
“Now, there is a great part of this recording that you cannot understand. Some of it you can, if you listen closely, understand. You will consider as evidence in this case only that portion of the recording which you understand. * *
When we see the short transcript of those portions of the tape recording which the court reporter was able to understand and compare it with the considerably longer typewritten matter placed with each juror, a great difference is discernible as to the clarity and coherence and as to what each conveyed. By a reading of the latter, the defendant Brady was the banker of the lottery operation here charged. For instance, appearing in the transcript before the jury are portions wherein Brady was designated as having said, “Just like you, and you can put yourself in my shoes, if you were banking this goddamn numbers * * * ” and, later, “I’m going to bank what they bring me. That’s all.” Without going in detail into any of tire other testimony, we note that the witness Phillips replied in the negative when asked on examination whether there was any conversation or any word spoken about *125 the subject of who was the banker or who was banking- the numbers.
It is not possible to say what effect was wrought through the process of synchronizing the typewritten words of the disallowed transcript with what may have been audible from the recording as it was being played. As the jurors read and listened and simultaneously assayed, under the court’s admonition, to sort out the audible from the inaudible and eradicate from consideration that which they could not hear or understand, the typed matter which remained before them throughout the audition could have etched on their minds words or impressions not derived from the sounds which emanated from the recording. At the conclusion of the playing of the tape before the jury, the court commented, “Apparently the amplification amplified the noise greater than it amplified the words. I don’t know whether you could understand much, if any. If you didn’t understand any, don’t consider anything.” Because of the inherent potency of the written words, we cannot say that there resulted the effectiveness intended by the court in its oral instructions that the jurors not consider portions which they read but could not hear or grasp through listening to the recording.
Almost uniformly, where a proper foundation has been laid to assure their authenticity, sound recordings are admitted into evidence. 58 A.L.R.2d, Annotation, Sound Recordings in Evidence, section 3, page 1029; Underhill’s Criminal Evidence, volume 1, 5th edition, section 121, Recordings, page 231. This rule applies with respect to admissibility into evidence in a criminal prosecution of partially inaudible or unintelligible recordings, unless the inaudible or unintelligible portions are so substantial as to render the recording as a whole untrustworthy. Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F.2d 49, cert. den. 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76, reh. den. 352 U.S. 937, 77 S.Ct. 219, 1 L.Ed.2d 170; Gomien v. State, Fla.App.1965, 172 So.2d 511, Third District’s opinion filed February 26, 1965; Wharton’s Criminal Evidence, volume 2, 12th edition, section 695, page 683. An underlying rationale of the rule is that a human witness may testify to such portion of a conversation as he overheard, regardless of the fact that other parts are inaudible. 58 A.L.R.2d, Annotation, section 7, page 1038.
From what we have said, based upon the particular circumstances, we are impelled to the decision that the court committed error which was harmful to the defendant Brady in allowing the jurors to use copies of the excluded typewritten transcript in connection with the rendition of the recording. A purpose of the recording was to establish the state’s case against Brady as “top man” or “banker” of the illegal operation, while the purpose of the excluded transcript, purportedly a reproduction of the conversation recorded, was to aid the jurors in following the recording.
The prejudicial effect of use by the jurors of the rejected transcript in connection with the playing of the recording of the conversation between Brady and the witness Phillips does not appertain as to the defendant Johnson. It was established that paraphernalia for operation, promotion, and conducting of a lottery were furnished by that defendant. The evidentiary exhibits against him included, for example, lottery paraphernalia consisting of number books, receipt sheets, Cuba books, score sheets, and recheck sheet, which, with money, were turned over to Johnson regularly as the result of the selling of lottery numbers for him. The sum of the evidence against Johnson indisputably proved that he was directly engaged in the illegal activity charged.
We do not here pass upon admissibility into evidence of the tape recording itself, since our reversal as to Brady and our af-firmance as to Johnson are for the reasons *126 stated. We do not know, upon a new trial, what another rendition of the tape recording might be like nor what the evidence will be. Neither are we called upon to enunciate what circumstances would render proper the use or admission into evidence of transcripts of sound recordings as a part of a trial procedure.
The judgment of conviction and sentence imposed against the defendant Johnson is affirmed; the judgment and sentence directed to the defendant Brady is reversed and remanded for new trial.
Affirmed in part and reversed in part.
SMITH, Acting C. J., KANNER (Ret.), J., and LOPEZ, AQUILINO, Jr., Associate Judge, concur.

. “The following is a transcript of a tape recording made on May 12, 1962 of a conversation between Frank Brady and Lambert Phillips:
Phillips: For years I put my money in that thing and never get it back.
Brady: I know just what you moan. I believe I’d kill the son-of-a-bitch if I hit and didn’t get paid.
Phillips: I ain’t going to do that.
Brady: I know, but you feel like doing it whether you do it or not. I know I would. I might even whip his ass just for good measure anyway, but still the easiest way is always the best way. That’s exactly what I’d do, I’d go ahead and take that and let him give me an I.O.U. He owes you $266.00.
Phillips: No. 264.
Brady: I’d dun his ass every week for that * * * (unintelligible portion) * * * I don’t know if he’s got bad feeling involving the money or what the hell’s wrong. Wing Ding got out there and said he wasn’t going to sell until he got it straightened out. So far as I am concerned it’s as straight as it’s going to ever get. You can either do what the hell you want to do. They haven’t brought anything over here other than that * * * (Unintelligible portion) * * * But selling damn sure ain’t bringing it. But I’ll advise you, I play so much numbers with the people and pay up the goddamn thing and then * * * (Unintelligible) * * *
Phillips: Supposing the number I did play come over here?
Brady: Suppose it hits again?
Phillips: Yes.
Brady: That’s a good problem.
Phillips: Yeah, may be.
Brady: I’d just let him pay me so much a week to me and go ahead and take the $60.00. That’s sure better than getting into trouble about it.
Phillips: All right, that’s a tough one. They stop selling for you?
Brady: Huh.
Phillips: They stop selling for you? They ain’t selling for you again, huh.
Brady: No, they’re finished.
Phillips: I think I hear that Taylor’s selling again.
Brady: You find out. They ain’t brought me nothin’ in the last three weeks now.
Phillips: No. This is the first week they started. They finally decided. They started yesterday.
Brady: Well, now I don’t know whether they’re going to bring me anything or not. Just like I say, if they don’t deliver, whatever they bring to me that’s what I pay. If they don’t bring to me before two o’clock, I don’t have nothin’ to do with it. If they bring it to mo I’ll pay exactly what the sheet says.
Phillijis: Ah, you see that the mistake that was made you backed the 1070 on 31.
Brady: No it wasn’t 1070, it was 680.
Phillips: 680 on 31. But then there’s that 1070 on 32.
Brady: 32 has 680 on it.
Phillips: But that should have represented 31 the 680.
Brady: But, I got to go by what the sheet says. I can’t, chief, I can't read a man’s mind. If lie’s got that on 31, in other words, where am I supposed to think that the 680 goes? It was aside of 32 so I don’t know where it goes.
Phillips: Listen, Lloyd told me his chart showed 1070 on 32. 6 something toward 31 but the chart that came to you, they made the mistake and the 6 something was towards 32 and the 1070 toward 81, but then they said * * * (Unintelligible) * * * showing the mistake that hurt me.
Brady: If they would have called me before 2 o’clock and said, ‘Look, I made a mistake on 32, it’s supposed to be 1070 instead of 680’ then I would have changed it, see. But if they’re going to call me after the goddamn race is run — I mean you can’t do that, that ain’t business. Just like you, and you can put yourself in my shoes, if you were banking this goddamn numbers and they turned in $10.-00 — they turn in say four numbers, they put twenty on one number and $10.-00 on the other two, well, after the number falls, they say ‘(-)*, I meant to have the $20.00 on so and so’ Now, what would you do, huh?
Phillips: * * * (Unintelligible) * * *
Brady: Well, that’s what I’m talking about, see.
Phillips: * * * (Unintelligible) * * * trying to railroad it.
Brady: That’s right. You would do the same thing I would. So that when the goddamn number falls you wouldn’t switch that $20.00 over on one of the $10.00 numbers.
Phillips: All right.
Brady: As far as I’m concerned they’re just trying to (-)* me up because I seen on his big sheet whore all that stuff *124 had been erased. I just ain’t going to go for all that (-)*. I’m going to bank what they bring me. That’s all. I understand your position, they let you down. But my advice to you would be to go ahead and take what you can get, because they hadn’t. In other words, I don’t think he’s got that much and I would just pester his ass about getting it. About so much a week after he goes into business. That would be the easiest and best way to do it.
Phillips: Well, I’ll check with him if you think that would be good advice. I will take that.
Brady: I think that would be the best deal you can get.
Phillips: Okey.”
*At each of the three blank spaces above enclosed in parentheses and indicated by an asterisk, we have deleted one obscene word, the omission of which in no way alters the meaning or import of the transcription quoted.