429 So.2d 45 (1983)
Ronnie Luke GOLDEN, Appellant,
v.
STATE of Florida, Appellee.
Harrison PORTERFIELD, Appellant,
v.
STATE of Florida, Appellee.
Nos. AF-322, AF-312.
District Court of Appeal of Florida, First District.
March 22, 1983.
*46 Michael E. Allen, Public Defender, and Steven L. Bolotin, Asst. Public Defender, Tallahassee, for appellant Golden.
William Eddins of Hosner, Taylor, Van Matre & Eddins, P.A., Pensacola, for appellant Porterfield.
Jim Smith, Atty. Gen., and Gregory C. Smith, Asst. Atty. Gen., Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Chief Judge.
Golden and Porterfield appeal from their convictions of attempted first degree murder of Jack Kenneth Roberts, aggravated assault, and robbery. Golden also appeals his conviction for later soliciting the murder of Frank Roberts.
*47 According to the State's version of the evidence, a disgruntled business competitor of Frank Roberts prevailed on appellant Ronnie Luke Golden to have Frank Roberts shot. Golden hired Lee who, in turn, subcontracted the job to Porterfield and Glenn. On the afternoon of September 4, 1980, the assailants attempted to carry out the contract, but Glenn shot and seriously wounded Jack Kenneth Roberts instead of the targeted victim, and robbed them both.
After Lee was arrested and jailed, he turned police informant. With Lee's consent, agents of the Florida Department of Law Enforcement (FDLE) electronically intercepted, listened to and recorded on cassette tapes the several conversations Lee then had with Golden between September 11 and 26, 1980. Certain of the conversations were in telephone calls placed by Lee, at the sheriff's office in Pensacola, to the telephone in Golden's office trailer, listed to Big Four Mobile Homes. Other conversations, intercepted by transmitting devices concealed on Lee's person and in his automobile, took place in Lee's automobile parked outside the trailer and in a convenience store parking lot. In the most incriminating of these, on September 26 in Lee's automobile, Golden discussed with Lee the failure of the September 4 attack on Frank Roberts and gave Lee $1,000 and a handgun for the murder of Frank Roberts.
Golden was thus charged with the September 26 solicitation and, jointly with Porterfield, for the September 4 offenses as well. Both Lee and Glenn pleaded guilty to the September 4 offenses and testified for the State at the trial of Golden and Porterfield in June 1981.

GOLDEN
Golden's lesser arguments are quickly disposed of. He urges that the trial court erred in permitting attorney Leo Thomas to withdraw as Golden's counsel on June 1, 1981, due to a conflict of interest arising from his firm's representation of a claimant against Golden on some civil debts, and in refusing to continue the trial from June 15, when the jury was selected, or from June 17, when the presentation of evidence began. We find no abuse of discretion in the court's excusing attorney Thomas. Nor did the court err in not continuing the trial. Neither attorney Thomas nor his successor, attorney Joseph Crowell, filed a motion for continuance of the scheduled trial. Indeed, attorney Crowell announced to the court on June 4, 1981, even before he and defendant Golden completed final arrangements for the representation, that he was available for the scheduled trial. Despite the trial court's expressed and understandable desire to begin the trial as scheduled on June 15, it previously having been continued repeatedly, nothing in the transcripts of hearings on the subject indicates that it would have been futile for Golden's new counsel to move for a continuance, should he have thought that necessary. We therefore find no merit in Golden's contention, urged for the first time in his motion for new trial, that the trial should have been continued.
We next consider Golden's argument the trial court should have suppressed, on constitutional grounds, all use of the electronically intercepted conversations, especially those of September 22 and 26 in personal meetings of Lee and Golden outside the trailer. The conversation in the convenience store parking lot was not arguably protected from electronic surveillance, and it is now clear that Golden had no constitutionally recognized expectation of privacy in conversations with Lee within an automobile parked outside Golden's trailer, whether or not the trailer was in any sense Golden's home as well as his office. Morningstar v. State, 428 So.2d 220 (Fla. 1982); Hill v. State, 422 So.2d 816 (Fla. 1982). As for Lee's telephone calls to Golden inside the trailer, from a remote telephone, there is potential support for Golden's privacy claim in Williams v. State, 420 So.2d 404 (Fla. 1st DCA 1982). But here the trial court rejected Golden's claim that his trailer was also his home, and found on substantial competent evidence that the trailer office of Big Four Mobile Homes was that alone. We find no error in *48 the trial court's denial of Golden's motion to suppress the recordings on constitutional grounds.
Golden's more substantial argument concerning the tape recordings is that his September 22 conversation with Lee, in which Lee asked for bond money, and the more incriminating September 26 conversation were improperly evidenced to the jury by recording copies of the original tapes and by a visual display, using a projector and screen, of fragments of written transcripts of those copies. The recording copies were received over Golden's single and regretably vague objection, "we object," directed to the less consequential September 22 recording only. Golden's appellate brief makes glancing reference to the copied recordings as not being the "best evidence," and more thoroughly criticizes the copies, not as copies per se, but as "altered" and "inaudible" copies. Golden argues further that the transcripts of those copies were hearsay and were yet another step removed from the "best evidence" and that displaying the transcripts to the jury by projector and screen overemphasized visually the probative value of the copied recordings.
Despite Golden's failure at trial to articulate some of the objections now argued here with respect to the auditory evidence, we think it appropriate to deal comprehensively with those objections, for Golden rather more clearly objected at trial to any use of transcripts, and particularly to their visual display by projector and screen.[1] The arguments made here in pursuit of those objections fairly call for a decision upon the evidentiary integrity of the original recordings, as well as upon the admissibility of recording copies of those originals, because any use of the transcripts plainly depended upon those antecedents. Golden argues, not without some superficial support in the authorities, that even those antecedents are insufficient  that the transcripts could not properly be used for any purpose at trial without authentication by a witness who personally overheard the conversations between Golden and Lee.
The premise of Golden's argument on this subject is that FDLE agent West, who authenticated the transcripts as accurately reproducing in written form the tape recordings, did not overhear the conversations themselves as they were recorded. There is some support for that premise in the trial testimony of the several FDLE agents,[2] although *49 agent West testified at the pretrial suppression hearing that he participated in "monitoring" the conversations as well as in recording them. However, the State's brief does not contest Golden's assertions on appeal that "West was not a participant in the conversation and was not present during the conversation" and "was not even one of the officers who electronically monitored that conversation." In view of that, we assume for purposes of discussion that Golden's premise is correct; we choose not to ground our analysis upon what we consider in law to be an irrelevant hypothesis, that West first listened electronically to the original conversations and then authenticated the transcripts as accurately reproducing the conversations.

The tape recording copies
The original recordings of the September 22 and 26 conversations were not offered and received in evidence, though they were available in court in the hands of agent West, and they apparently were marked for identification and withdrawn after the trial. Golden made no point in the trial court of their omission from evidence, so on the latent question of accounting for and authenticating the original recordings, as a predicate both for the copies and for the transcripts derived from the copies, we are content with agent West's testimony minimally identifying and qualifying the original records, supra n. 2.
The copied recordings of the September 22 and 26 conversations were authenticated as faithfully reproducing the originals, insofar as their contents were relevant, by Dr. Holbrook's testimony. Holbrook, an expert in voice analysis in sound recordings, prepared the copies at the State's request in order to make the spoken words more audible, clarifying but not changing them in any substantive way, and to suppress "environmental" noises. Holbrook's testimony thus qualified the copies as more understandable but not altered versions of the originals. With that authentication the enhanced copies  as we shall refer to them  were as competent as the originals and more probative. See Fountain v. United States, 384 F.2d 624, 631 (5th Cir.1967), cert. denied sub. nom., Marshall v. United States, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968).
Golden then complains that despite Holbrook's efforts the two enhanced recording copies were largely inaudible. When the State first played the September 26 recording to the jury through loud speakers, the court reporter, evidently listening for the first time and without special equipment, wrote "inaudible" in the record. But Dr. Holbrook earlier testified that the words on the enhanced copies "would jump right out at you" when heard through high-quality headphones that were brought to court and were available for use by counsel or the jury.
Arguing that the enhanced copies are inaudible notwithstanding Holbrook's testimony, Golden's appellate counsel, who apparently never heard the recordings through headphones that were available to trial counsel and the jury, asked that we listen to the recordings. In an abundance of caution, we did so by use of conventional office dictating equipment. The September 22 recording is clearer but relatively less incriminating, and what we shall say about exhibit 23, the enhanced recording of the September 26 parking lot conversation, suffices for both exhibits. We find that both tapes are sufficiently audible to have been received in evidence.
Lee testified before the State introduced the recordings between Golden and Lee into evidence. In relating the substance of their September 26 conversation, Lee explained that the term "piece," used in the conversation as preserved on the tape, referred to a .357 caliber Python handgun that Golden gave him for the killing of Frank Roberts. Through repeated listening to the tape we have identified the following audible statements having obvious relevance:

Lee: I could still get the $1,000 if I take care of it.

Golden: That's right.

Lee: You know, by tomorrow it will be did because he sure needs killing anyways... .

*50 ... .

Golden: Which one you want?

Lee: That .357, the other one, the first one, . .. both of them, but I think the .357 would be the best.
... .
Well, when can I get that piece, and I'll get that thing take [sic]... . I need the money ... If I can get it taken care of today or first thing in the morning ...

Golden: Well, you know, it's still available. Just, you know, I need to know that everything is took care of.
... .
Well, the thing about it is, you know, I'm done out nearly half the money now and [he] ain't got a ... scratch... . Are you going to get this damn thing done?

Lee: Oh, I'm going to get it did. I'm guaranteeing the job for you this time.
Having probative force in themselves, with no evident loss of context, those audible recorded statements were admissible even though other fragments of the conversation are not as clearly audible. See Odom v. State, 403 So.2d 936, 940 (Fla. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); State v. Steinbrecher, 409 So.2d 510, 511 (Fla. 3d DCA 1982); Gomien v. State, 172 So.2d 511, 515 (Fla. 3d DCA 1965).

The transcripts and visual display
During Golden's cross-examination by the State, portions of the enhanced September 22 and 26 recordings, already received in evidence, were played again in open court while transcript excerpts of the same statements, prepared by FDLE agent West, were projected on an overhead screen. West, who neither participated in nor, we assume, listened to the Golden-Lee conversation when it occurred, testified that the transcripts so depicted were true and accurate copies of the enhanced recording exhibits.
Golden argues that any evidentiary use of a transcript of a tape recording violates the "best evidence" rule and also that it is hearsay unless authenticated by one who not only listened to the recording but also personally heard the original conversation. Golden also argues that the trial court's particular use of the transcript, permitting its visual display to the jury by means of projector and screen, improperly displaced or augmented the primary evidentiary material, the tapes. Golden extracts these arguments from Grimes v. State, 244 So.2d 130 (Fla. 1971); Waddy v. State, 355 So.2d 477 (Fla. 1st DCA 1978), cert. denied, 362 So.2d 1056 (Fla. 1978); Carrizales v. State, 345 So.2d 1113 (Fla. 2d DCA 1977), rev'd on other grounds, 356 So.2d 274 (Fla. 1978); Duggan v. State, 189 So.2d 890 (Fla. 1st DCA 1966); and Brady v. State, 178 So.2d 121 (Fla. 2d DCA 1965).
We cannot accept either Golden's interpretations of the cited decisions or the arguments he develops from them. Those decisions do not collectively stand for the proposition that the jury must be left to contend with authentic tape recordings that are difficult to understand without the sense of sight or some other aid to understanding. The decisions simply distinguish between primary evidence on the one hand and aids-to-understanding on the other, and insist only that the roles not be reversed, that aids-to-understanding not be treated as evidence independent of or displacing the necessary primary evidence. Nor do the decisions impose an artificial requirement, belied by modern recording technology if not by common sense, that for competency's sake the same witness who verifies that a transcript accurately reproduces a sound track must also have been in a position to verify that the sound track accurately recorded the original conversation. On the latter question, the cited decisions simply require that the proof as a whole, by two or more witnesses if necessary, verify both steps in chain of authenticity: that the tape accurately recorded the conversation, and that the transcript accurately reproduces the tape.
Brady, the 1965 Second District Court of Appeal decision that is first in chronology, aptly illustrates how a tape recording transcript, though susceptible of *51 proper use to assist the jury's understanding of a recording that is the "best" or primary evidence, can be abused to the point of displacing that primary evidence and masking its irremediable faults. In Brady, 178 So.2d at 121,
[t]he recording was admitted into evidence, while the transcript, although excluded as evidence, was permitted by the court to be used by each juror in the form of copies distributed among them to aid them in their understanding of the recording as it was being played.
The Brady court critically commented that the written words in the transcripts handed the jurors tended to displace, in their consideration, the more garbled words heard indistinctly when the tape was played. 178 So.2d at 125. But it was not the mind's greater retentive and reflective power through the eye and ear together that was decisive in Brady. The transcript, which was described by the court (and we assume by the prosecutor) as having been "prepared by officers of the law through repeated reruns or playbacks of the recording and the subsequent dictation of what was made of it into a dictaphone, whence it was reduced to typewriting by a stenographer in the prosecuting attorney's office," simply appeared in court with those unsworn credentials. 178 So.2d at 123-24. The transcript was not received in evidence. Nor could it have been, even if the tape recording were not the "best" evidence, for the transcript was not authenticated in a way meriting receipt in evidence. Beyond that, there was a wide disparity between what the transcript represented and what the jury could reasonably be expected to hear by playing the recording itself, and one particularly damaging conversation was among the passages set out in the transcript but not audible on the tape. This combination of flaws in the transcript  no sworn authenticity, the incurable disparity between what was seen and what was heard, and the physical delivery of multiple transcript copies to the jury  dictated reversal in Brady. The court concluded its decision with words belying an intention to exclude altogether in all circumstances the use of sight-oriented aids to auditory understanding:
We do not know, upon a new trial, what another rendition of the tape recording might be like nor what the evidence will be. Neither are we called upon to enunciate what circumstances would render proper the use or admission into evidence of transcripts of sound recordings as a part of a trial procedure. (178 So.2d at 126.)
This court's 1966 decision in Duggan is not to be distinguished quite so decisively, and Judge Carroll's opinion must be carefully analyzed to avoid the unwarranted implication that one must personally be present, listening to a statement as it was made and recorded, in order later to testify that a transcript is an accurate rendition of the tape recording. In Duggan as here the tape recordings were introduced as primary evidence, but the court held that the transcripts, prepared by a court reporter who testified to his efforts, were inadmissible. The court stated, 189 So.2d at 891:
It is our opinion that the written transcripts of the three tape recordings were inadmissible in evidence under several established rules of evidence: permitting the transcripts to be furnished to the jury violated the best evidence rule, since the tape recordings themselves were the best evidence; the court reporter who made the transcripts was not present when the recordings were made, and hence his transcripts constituted pure hearsay and were inadmissible under the hearsay rule; and the jury's use of the transcripts violated the rules against undue repetition and improper emphasis.
Analyzing Duggan's three-fold reason for disapproving the transcripts in that case, we read the "best evidence" objection as confined to the particular ground stated: that in "permitting the transcripts to be furnished to the jury" and carried into their deliberations, the trial court treated the transcripts as documentary evidence equal in competency to the recordings, which they were not. But if all tangible aids to understanding other "best evidence" were objectionable, *52 however discreetly employed, then of course no aids-to-understanding could ever be used and Brady's reservation of that question was futile. Later decisions confirmed that the availability of the "best" evidence, the recording itself, does not preclude proper use of recording transcripts as aids-to-understanding. E.g., Waddy, infra.
Duggan's second ground for excluding the court reporter's transcripts of the tapes was that the transcripts "constituted pure hearsay." In the above-quoted summary of the court's holding, the transcripts are characterized as hearsay because "the court reporter who made the transcripts was not present when the recordings were made." 189 So.2d at 891. But later in the opinion, with particular reference to an especially damaging statement appearing in a transcript though inaudible in the recording,[3] the court elaborated its hearsay objection, 189 So.2d at 892, in a way recognizing an alternative method of proving the competency of transcript:
Under no recognizable theory could such a transcript be received in evidence. The court reporter could not testify as one who had witnessed the events recited in the transcript, nor could he testify as an expert witness who is professionally skilled in the understanding of indistinguishable taped conversations. Since the conversation recited in that particular transcript pertained to the most critical issue in the prosecution's case against the appellant  the alleged bribery "pay-off" payments  the highly prejudicial effect of admitting the said transcript in evidence is obvious. (Emphasis added.)
Duggan therefore does not hold that, to overcome a hearsay objection, the witness who testifies that a transcript faithfully reproduces a recording must also vouch that the tape recording faithfully recorded the original conversation. We can think of no reason why Duggan should be read as requiring that agent West or any other single witness, rather than the several employed here in series  agent Smith, who described the surveillance and recording apparatus, agent West, who identified the original recordings, West and Dr. Holbrook, who authenticated the recording copies, and again West, who vouched for the derived transcripts  establish the necessary chain of fidelity, conversation-to-recording-to-transcript.[4]
*53 In the above-quoted passage from Duggan, the third ground for disapproving the transcripts as employed in that trial was that "the jury's use of the transcripts violated the rules against undue repetition and improper emphasis." 189 So.2d at 891. This, plainly, was an objection to handing multiple copies of the transcripts to the jurors individually and permitting them "to take with them into the jury room their copies of the transcripts of the tape recordings." 189 So.2d at 891. We need not attempt to reconcile this apparent holding in Duggan with the court's apparent reservation of that issue, 189 So.2d at 892, for in any case the stated objection to that use of the transcripts was previously made in Brady, supra, was later repeated in Waddy, infra, and was seemingly endorsed by the Supreme Court in Grimes, infra. No transcripts, whether in single or multiple copies, were taken into the jury's deliberations in the case now before us, nor were any handed into the jury box. And we conceive, for reasons to be stated below at greater length, that the momentary visual display of transcript fragments during Golden's cross-examination, by means of projector and screen, did not overemphasize the evidence as disapproved in the cited cases.
The Supreme Court's 1971 decision in Grimes is important to the present issues chiefly for its discussion of the authentication necessary as a predicate for using a transcript of the defendant's recorded statement. Grimes' "best evidence" objection and the Court's discussion strongly suggest that the tape recording itself was not introduced in evidence at the trial. If we are correct in that, then the Court's discussion was not concerned with verifying a transcript as an aid to understanding a recording regularly in evidence, but was concerned instead with the independent competence of a transcript that could not be verified by reference to a recording in evidence. Thus the Court emphasized both that the testifying police officer "was present when the recorded statement was taken and, in fact, took the recorded statement," and that he testified that he "checked the recording itself and that the transcript was an accurate copy." 244 So.2d at 135. The Court appears to have attributed some degree of competence to the transcript as the recorded past recollection of the officer who conducted the interview, see n. 4 supra. We do not read Grimes as addressing the question before us here and in Waddy, nor as holding that, before a transcript of a recording in evidence may be used as an aid to understanding such a recording, the same witness who verifies the accuracy of the transcript must also verify the accuracy of the recording.
Carrizales, a 1977 decision of the District Court of Appeal, Second District, expressly did not reach appellant's objection "that his statement was not properly authenticated since no one present when the statement was taken testified that the transcript accurately reflected the actual interview." 345 So.2d at 1115. But in advising the trial court to "make certain that the transcript of appellant's tape-recorded statement is properly authenticated before admitting it into evidence," 345 So.2d at 1116, Carrizales may imply, citing Duggan, that authentication by a person present when the statement was made would be necessary if upon retrial the state proposed to read into evidence a transcript that other testimony *54 showed accurately reproduced the separately authenticated tape recording. If that is the purport of Carrizales, we respectfully disagree with it, for the reasons we have stated.
This court in Waddy stated our view of the matter in a few words, 355 So.2d at 478:
The court erred in allowing the transcription of Waddy's tape recorded statement into evidence and in permitting the jury to take it into the jury room during its deliberations. The best evidence was the tape recording. Duggan v. State, 189 So.2d 890 (Fla. 1st DCA 1966). If the transcript had been properly authenticated, which it was not, it could have been read to the jury. Grimes v. State, 244 So.2d 130 (Fla. 1971). But even then, it should not have been admitted into evidence nor should the jury have been permitted to take it into the jury room for use during its deliberations. Grimes, supra.
In the factual context of Waddy, the court's comment on the absence of proper authentication for the transcript is apparently a reference to the absence of authenticating testimony either from the "unidentified stenographer" who prepared the transcript, or from the deputy who took the original statement and "placed the underlinings on the statement and had a stenographer correct those portions of the statement after transcription." 355 So.2d at 478. Had either witness so authenticated the transcript as faithfully transcribing the recording, the transcript presumably "could have been read to the jury" under the court's ruling, though the transcript was inadmissible as independent evidence and could not have accompanied the jury into its deliberations. The transcript evidently did not satisfy competency requirements as the recorded past recollection of the deputy who conducted the interview, supra n. 4, for the court discussed the competency of the transcript wholly in terms of its derivation from the recording.
We therefore conclude that the aggregated testimony of FDLE agents West and Smith established that the original tape recordings, available in court though not introduced in evidence, competently recorded the conversations between Golden and Lee on September 22 and 26; further, that the testimony of Dr. Holbrook, the expert, authenticated the enhanced copies of the recordings sufficiently for their receipt in evidence; and that the testimony of agent West authenticated the transcripts sufficiently for their proper use to aid the jury's understanding of the enhanced recording copies as they were played.
It remains to be said only that the circuit judge did not abuse his discretion in permitting the State to display to the jury, by means of projector and screen, incriminating fragments of the transcripts. At that point the derived competence of the transcripts had been shown; the "best evidence" was before the jury in the form of the enhanced recordings; and the visual display assisted the jury in concentrating on particular words uttered by Golden, even as the prosecutor played the recordings and asked Golden to verify and explain his apparent conversations with Lee on September 22 and 26 and Golden's offer of $1,000 and a .357 caliber handgun for killing Frank Roberts.
In Brady, Grimes, and Waddy we find precedent for reading to the jury, but not for physically delivering to the jurors for use in their deliberations, variously authenticated transcripts of the defendant's earlier statements. In Waddy and by implication in Brady we find precedent for characterizing the proper use of such transcripts to aid the understanding of other evidentiary material that is the "best" evidence in the sense of being a step nearer the source, the actual conversations to be evidenced. The only question, then, is whether by engaging the jurors' sense of sight, instead of simply reading the transcripts into the record, the trial court improperly permitted the State to violate "the rules against undue repetition and improper emphasis." E.g., Duggan, 189 So.2d at 891.
We think the trial court did not err. The judge appears to have held the State's questioning of Golden close to the recordings *55 themselves, requiring that the recordings be played for the jury's listening as the cross-examination progressed, and preventing undue reliance on the visual display alone. Playing and displaying Golden's recorded words to him and to the jury as Golden testified was logistically difficult, to be sure, but the process cannot for that reason alone be condemned. Indeed, since that gave Golden an instant opportunity to refute or explain the apparent incriminating effect of the recordings and the visual display, the process was all the more useful in determining the true purport of Golden's conversations with Lee. We do not intimate that the trial court's management of the visual display in this case is the only proper method. It is enough for present purposes to find that the trial judge took evident care to prevent the visual display from displacing entirely the recordings on which the display was based.[5]

*56 PORTERFIELD
Porterfield complains, on the same grounds urged by Golden, of the State's use of transcripts of the recorded Golden-Lee conversations. We reject Porterfield's arguments for the reasons stated in respect to Golden's.
Porterfield's only other substantial argument is that the trial court erred in permitting the State to cross-examine him concerning his knowledge of a wristwatch that officers found in searching Porterfield's car on September 4, and in permitting the State thereafter to introduce testimony about that discovery, including the watch itself, to impeach Porterfield's denial on cross-examination that he ever possessed or had knowledge of the watch. Before trial, the court had suppressed that evidence because the warrantless search was found to be unreasonable by constitutional standards. Other testimony at trial proved that the watch was taken from Jack Kenneth Roberts during the September 4 robbery and attempted murder.
We disagree with Porterfield's argument that the cross-examination and impeachment evidence subsequently received concerning the watch violated constitutional limitations on the use of illegally seized evidence, as exemplified by United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). See also Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).
The question is whether, as stated in Havens, the cross-examination was "reasonably suggested by the defendant's direct examination." 446 U.S. at 627, 100 S.Ct. at 1917, 64 L.Ed.2d at 566. If Porterfield's direct testimony went beyond a general and privileged denial of guilt and into particular subjects pertinent to his alleged participation in the crime, cross-examination and impeachment on those subjects was permissible though it employed evidence suppressed and unavailable to the State in its case in chief. Dornau v. State, 306 So.2d 167 (Fla. 2d DCA 1975), cert. den., 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975), illustrates how, by confining his testimony on direct examination, a defendant may be held to have avoided exposure to cross-examination and impeachment, using suppressed evidence, on vulnerable subjects not addressed by his direct testimony.
It would serve no purpose to labor the comparative analysis in Havens and other decisions[6] of the direct testimony and cross-examination in those cases. For what cross-examination is "reasonably suggested" by any direct examination testimony depends, obviously, on the scope and content of that particular testimony in that particular case.
In this case, Porterfield's direct examination testimony concerning his actions on September 4, when Jack Kenneth Roberts was robbed and shot by Curtis Glenn, amounted to a comprehensive description, studded with protestations of innocent behavior by Porterfield, of conspiratorial conversations and actions by Lee and Glenn in Porterfield's presence on that fateful day, before and after the shooting. This affirmative testimony by Porterfield was of course wholly false, according to the State's view that Porterfield was one of the assailants.
*57 Thus, Porterfield testified on direct examination that he went to the Beacon Service Station on E Street on the morning of September 4, to have his car repaired. There, he said, he ran into Lee, whose dubious reputation Porterfield took pains to describe, and Glenn, who "ran a dope house right around the corner." Lee engaged Porterfield in conversation about Porterfield selling an "antique car," an old Buick. But then Lee abruptly declared, "I know a man that wants a man shot and he's willing to pay $1,000," to which Porterfield responded, he said, in protest and disbelief. Then Glenn appeared, negotiated with Lee in Porterfield's presence ("half of it up front and we can talk business"), and closed the deal. To which Porterfield again appropriately responded, "Man, you know, you ain't serious about that?", and "I don't want to have nothing to do with it, you know." Porterfield went on to say that he did not get in Lee's car during the morning, nor did Lee or Glenn get in Porterfield's car, which he left parked at the Beacon Service Station.
Porterfield then said he went with one Melvin, in Melvin's van, to pick up a solenoid switch for Porterfield's car, and eventually returned to the Beacon after detouring to McDonald's for lunch and to Porterfield's house for a shirt. In this interval, Porterfield's testimony seems to suggest, Lee and Glenn must have carried out the robbery and shooting.
Back at the Beacon after his errands, Porterfield said he again encountered Lee and Glenn, whereupon the threesome set out in Lee's car to inspect the antique Buick. And "Irvin [sic; Glenn?] was telling me, I don't know if he was telling me or what, ... `I shot him. I put it right in him.'" "And they were just laughing and Irvin was telling him what a good job he did ... ." "I asked what was going on, what happened, you know. And he was saying, you know, that little thing we were talking about this morning. And I said, `Man, I'm not pulling nothing like that, no kind of way.'"
To Porterfield's surprise, Lee drove first not to inspect the antique Buick but to a trailer park, where Lee got out "and he asked the man [presumably Golden] for $1,000" and showed him a diamond ring, taken from one of the morning's victims as proof of the shooting. At that point Porterfield asked Lee to "take me back down to the Beacon," adding, "I don't really want to take a look at the car now." But look they did, after driving to another destination, and "it was a '52 or maybe a '51 Buick, an old Buick in good shape." Whereupon Lee and Glenn started to argue about money; Lee "jumps in the car" and drives away, while "Glenn walks around huffing and puffing." After a while, Lee returned.
Though Porterfield said he still insisted on being dropped off at the Beacon, Lee and Glenn were preoccupied with getting "the money." After an unsuccessful attempt to pawn or sell the ring to one Sar, "we turned right around in the road and went back" to try again. "And I told him that if he wasn't out there that I was leaving you and him, if necessary. So, he [Lee] agreed to that." This time Lee had better fortune, for he emerged from Sar's place with a check in his hand. Then the travelers set out for the First National Bank, where after some difficulty with a teller, all described by Porterfield, Lee got the cash and "throws it back to Glenn" in the back seat. "Then Glenn counts the money and says this ain't all my money... . Then [Lee] said, `Well, what do you expect? You shot the wrong people, you know.'"
Finally back at the Beacon, Porterfield found his car gone. It had been searched and towed away by law enforcement officers who testified that they recovered the stolen wristwatch "protruding from under the front seat."
Porterfield's argument based on Havens is that he could not be cross-examined and impeached concerning his possession of the suppressed stolen watch since Porterfield did not mention the watch, but only the ring, his car, and so on, on direct examination. We think, on the contrary, that Porterfield's *58 direct testimony detailing his amazing excursion with Lee and Glenn on September 4 fairly elicited the State's cross-examination and impeachment by reference to a watch found in Porterfield's car in the same timeframe.
The convictions of Golden and Porterfield are AFFIRMED.
ERVIN, J., and SHAW, LEANDER, Associate Judge, concur.
NOTES
[1] Golden's counsel objected as follows:

We had a court reporter or somebody who typed up those tapes and if the jury hears the tapes and then they see up there as what the tape says, that will be a transcript of what somebody else said the tape said, and the tapes themselves are the best evidence. I object to it.
... [I]f we hear something and we've got it right in front of us, we are inclined to believe what we see as exactly what we hear. So, what you are doing is starting off with a guide to follow.
[2] Agent West testified at trial that he was among the FDLE officers who "surveil[ed] and participate[d] in the investigation where Irvin Lee met personally the defendant Golden," but he stopped short of saying that he listened to their conversations as they were initially overheard and recorded. The testimony of agent Smith suggests that he and agent Robinson recorded and overheard the conversations, but it was West's trial testimony, not Smith's or Robinson's, that authenticated (without objection) a cassette tape recording, apparently marked as an identification exhibit only, as "a true and accurate recording of that meeting [of September 22]," and who somewhat less satisfactorily identified (but again without objection) the original tape recording of the September 26 meeting. After the enhanced recording copies were later received in evidence, through qualifying testimony by West and Dr. Holbrook, it was again West, not Smith or Robinson, whose testimony authenticated the transcripts as faithfully reproducing the sound of those recording copies. West did not attempt to qualify the transcripts as directly reproducing, as from memory or simultaneous transcription, on September 22 and 26, the conversations themselves.

Although the trial testimony of agent West authenticated the transcripts, the trial court attempted to secure further verification or correction of the transcripts by the court reporter who reported the trial and did not testify. That further attempt to insure accuracy was risky in the sense of undermining West's testimony, which was not significantly cross-examined, but we do not consider that the additional minor editing by the unsworn court reporter destroyed the facially sufficient testimony of agent West authenticating the transcripts.
[3] Duggan does not say in so many words that the statement referred to was inaudible, but that seems a fair inference from the court's reference to "indistinguishable taped conversations" and the necessity for expert translators. Moreover, since a sister court had already held in Gomien, supra, that "because portions of a recording are unintelligible is no basis for keeping the intelligible part out," 172 So.2d at 515, and Gomien was not mentioned in the Duggan opinion, it is highly unlikely that Duggan intended to exclude the particular statement referred to, though audible, because other portions of the same conversation were "indistinguishable" in the recording.
[4] A hearsay objection is, of course an objection to competency, invoking the law's preference for a witness who has a present recollection of and can testify from personal knowledge to the truth of the matters related. The reasoning behind the "past recollection recorded" exception to the hearsay rule, permitting a witness's written record of past events to be read into the record in place of or augmenting the witness's testimony from present recollection, is somewhat analagous to the reasoning that justifies one witness vouching for the fidelity of the tape recording, having personally heard the conversation, and another vouching for the fidelity of the transcript of that recording. Formerly it was held that "past recollection recorded" evidence is inadmissible unless the witness whose record is offered has a total memory failure. 3 Wigmore on Evidence § 738 at p. 91, n. 2 (Chadbourn rev. 1970). Florida decisions, both old and comparatively recent, have emphasized, when approving "past recollection recorded" evidence, that the witness "had no present recollection" independently of the record. E.g., Smith v. Hinkey, 98 Fla. 132, 123 So. 564 (1929); Montgomery Ward & Co. v. Rosenquist, 112 So.2d 885, 887 (Fla. 2d DCA 1959) (transcript prepared by a court reporter from shorthand notes held properly read to the jury as the reporter's past recollection recorded). See also 2 Jones on Evidence § 12:37 (6th ed. 1972). But under the Florida Evidence Code, § 90.803(5), Fla. Stat. (1981), a recorded recollection may now be read into evidence if the witness merely "now has insufficient recollection to enable him to testify fully and accurately." On the competency question alone, this more hospitable treatment of recorded recollections recognizes that a faithfully recorded recollection, recorded when the witness had the matter fresh in his memory, can be more probative than direct testimony from an imperfect memory. Similarly, Lewis v. State, 335 So.2d 336, 340 (Fla. 2d DCA 1976) (dictum) said of a tape recording: "There could have hardly been stronger evidence of the conversation than the recording of what actually was said."

A court reporter's transcript of shorthand notes of a past witness statement, as in Montgomery Ward, and an accurate transcript of a tape recorded conversation, as in the present case, share similar claims of competency: in neither case would it now be required that the authenticating witness (the court reporter on the one hand, the tape recorder operator and the transcriber on the other) had personal memory of the statement recorded; and, aside from questions in either case about the accuracy of the written transcript (whether the transcriber accurately reduced to writing the shorthand notes on the one hand or the tape recording on the other), no reason appears why one witness may not vouch for the original record (the shorthand notes or the tape recording) and another for the accuracy of the transcript.
[5] At the outset of cross-examination, the trial judge stated:

Gentlemen, I'm going to permit the use of this by the State, of a copy of the transcript during the examination of Mr. Golden for the purpose of identifying parts of the conversation. The transcript itself will not be submitted to the jury during their deliberations. They will be furnished the tape and the mechanical apparatus to hear the tape, including the headphones which amplify the voices and make them more distinguishable.
The length of the tapes and the background noise and confusion that is apparent from hearing the tapes without the aid of those earphones is such that I find it necessary to allow the transcript to be used during the examination, and you may use it for that purpose, Mr. Johnson.
MR. JOHNSON (prosecuting attorney): May the projector be used so a copy may be shown to the jury?
THE COURT: You may use the projector for those certain parts, but I don't want the jury reading a transcript of this tape while the witness is under examination.
In explaining to the jury the process to follow, the trial judge further elaborated:
During the course of examination of this witness, the State will be permitted to make reference to certain portions of a transcription of these tapes that you have previously heard and will hear in part again. This transcription is not evidence and will not be submitted [to you] for any purpose beyond the examination by counsel here in the courtroom. You may consider the tapes themselves and you will be allowed to use the mechanical apparatus that has been provided including the two sets of earphones to listen to those tapes when it is appropriate for you to hear them. Because of the length of these tapes and what is obviously difficulty in hearing through these large speakers, the State will be permitted to use, during its examination, a transcript of a portion of these tapes and it can be used only for that purpose and it will not be made available to you at any time during the deliberations or otherwise [except] as it may be reflected on the screen for clarity or for reference purposes.
The following excerpts of the prosecutor's cross-examination of Golden exemplify the manner of the prosecutor's use, under the trial court's control, of both the tape recordings and the visual display:
Q. Let's move on.
You were really concerned when he [Lee] got out of jail about his car being bugged, weren't you?
A. Not particularly. I remember those words [from the recording]. Go ahead.
Q. You asked him several times if he was bugged, didn't you?
A. He was telling me about some trouble he was in.
.....
Q. Okay. Let's look at that transcript and see if you can see 
MR. CROWELL: He didn't ask a question yet.
THE COURT: Sustained.
.....
Q. Let me refer you to page two of the transcript.
MR. CROWELL: Let him refer to page two. He's not asking a question.
THE COURT: I'll sustain the objection.
.....
Q. Go ahead, Mr. Golden, go by the transcript.
A. All right.
Q. Read that statement now.
MR. CROWELL: I think he should clarify what statement he's talking about.
.....
THE COURT: Publish the statement and ask your question.
Q. Do you remember Lee making the statement, "When he come and told me that he did it, I thought sure it was did. See, that's when I told you, you know " And you said, "Your car may be bugged. You don't even know, you never know if it sits down there long enough."
.....
Q. Do you remember your response? "Your car may be bugged. You don't ever know if it's been down there long enough."
Do you remember making that comment?
A. I may have, but I don't remember. But I may have.
Q. Let's see if we can hear it on the tape.
A. Okay.
(Mr. Johnson plays tape.)
.....
[6] United States v. Brewer, 685 F.2d 1003, 1013 (7th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 101, 74 L.Ed.2d 91 (1982) ("Initially, we note that with the exception of the gun matter itself the timeframe of the direct examination entitled the prosecution to a wide probing of Doss' activities."); United States v. Miller, 676 F.2d 359, 364 (9th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 126, 74 L.Ed.2d 123 (1982) (Miller's direct testimony reviewed the details of each of the seven transactions which reasonably suggested the government's inquiry on cross-examination).