518 So.2d 342 (1987)
Judith Nichole LOREN, Appellant,
v.
STATE of Florida, Appellee.
No. BD-485.
District Court of Appeal of Florida, First District.
December 15, 1987.
Rehearing Denied January 29, 1988.
*343 Ronald W. Johnson of Kinsey, Myrick, Troxel, Johnson & Walborsky, Pensacola, for appellant.
Jim Smith, Atty. Gen., Royall P. Terry, Jr., Asst. Atty. Gen., Tallahassee, for appellee.
*344 SMITH, Chief Judge.
Appellant Loren was indicted on a charge of first degree murder of her husband, Kenneth Ray (Buddy) Cummings, along with codefendants Wesley Allen Briggs and Dean Charles Wilson. At appellant's separate jury trial, Briggs testified that he shot and killed the victim at the instance and request of appellant, who anticipated receiving double indemnity insurance benefits of $200,000 on Cummings' life. Appellant was convicted by the jury of first degree murder, and was sentenced in accordance with the jury's recommendation to life imprisonment without possibility of parole for twenty-five (25) years.
On appeal, the sufficiency of the evidence of guilt is not challenged. Instead, appellant seeks reversal and a new trial based upon her claims that various rulings of the trial court resulted in denial of her constitutional right to a fair trial. She asserts, particularly, that the trial court's denial of her motions for continuance denied her effective assistance of counsel. She also asserts as grounds for reversal rulings of the trial court pertaining to alleged discovery or Richardson violations, and the court's ruling allowing the jury, during the playing of audio and video tapes in the courtroom at trial, to use and refer to a typed transcript of these tapes. The tapes depicted a late-night motel room meeting between appellant and codefendant Briggs, wherein, among other things, Briggs sought and obtained from appellant a promise of monetary assistance to aid him in absconding to avoid arrest for the murder. Having carefully considered each of the points and arguments raised by appellant, and having reviewed the transcript of the trial proceedings in its entirety, we conclude that no reversible error has been presented.
Because the points raised on appeal must be viewed against the backdrop of the events leading up to the indictment and trial, and the facts as revealed during the trial itself, a brief factual recitation is necessary.
That codefendant Briggs shot and killed Cummings on October 14, 1983, at Cummings' home in Chipley, Florida, was proved by overwhelming evidence, and was conceded by defense counsel at the trial. The jury heard directly, through the testimony of Briggs, of his romantic involvement with appellant beginning shortly after her separation from the victim in the summer of 1983, and of appellant's participation with Briggs in a scheme for the murder of the victim in order to receive the insurance proceeds. After obtaining money from appellant, Briggs bought a gun from an individual in Pensacola, where he and appellant both resided at the time of the shooting. On October 14, 1983, Briggs and codefendant Dean Wilson bought a box of Blazer ammunition from a gun shop in Pensacola, and both drove in a rented automobile to Cummings' home in Chipley, using directions given by appellant.
In furtherance of the planned killing, Briggs had previously devised a plan for gaining access to Cummings' home by making telephone calls (using a false name) to set up an appointment to look at Cummings' home, which appellant had advised Briggs was for sale. These telephone messages were recorded on the message recording device in Cummings' home, a circumstance which later proved to be of crucial importance in linking Briggs to the homicide. Although the plan called for Cummings to be overpowered and drowned in the pond behind his house where he often swam  according to information furnished by appellant to Briggs  thus giving the appearance of an accident, the plan went awry when codefendant Wilson failed to position himself so as to assist in carrying out this method of disposing of Cummings. Consequently, Briggs, in accordance with his alternative plan, shot and killed Cummings on the spot with a single bullet to the head.
The jury also heard testimony concerning the issuance of the insurance policy on Cummings' life, which named appellant as the owner and beneficiary, and of her admitted payment of the renewal premium in July 1983, even though she and Cummings were at the time separated under strained *345 circumstances, including Cummings' threats to kill her.
Further, the jury heard testimony from Briggs, from appellant herself, and from witnesses Darrell Senn, James Stone, Steve Carden, and Steve Simons, that she hated Cummings and wanted him dead, particularly after learning in August 1983 of Cummings' attempted sexual molestation of her daughter. Steve Carden testified that appellant offered him money ($5,000.00) to kill Cummings.
Appellant denied that she arranged for Briggs to kill her husband in return for a percentage of the insurance proceeds. She admitted, however, talking to Stone, Carden and Simons about wanting Cummings dead, about being extremely angry with and hating Cummings, and of various ways in which Cummings' death might occur, such as by drowning, or another "accident" of some kind, or by being bitten by poisonous snakes. Although she denied ever asking any of them to kill Cummings, appellant admitted that she "might have mentioned money" in talking with them, but they didn't take it seriously, and neither was she serious. Appellant further stated they didn't want them to kill "Buddy" (Cummings), but that she just wanted something to happen to him.
Briggs testified that appellant knew the day after it happened that he had killed Cummings. A witness, Darrell Senn, a boyfriend of appellant's daughter, who resided in appellant's home in Pensacola at one time, testified that appellant told him about Cummings' impending death, stating: "They're going to get him tomorrow night." According to Senn, appellant told him she would have an alibi, since she would be out with a preacher that night; and that she further told him two mornings later: "They got him. Buddy is dead."
Appellant denied that Briggs told her he was responsible for the death until New Year's Day, 1984, and she testified that he also later told her that he had not done it, but again told her after that that he had. Nevertheless, it is not disputed that appellant and Briggs maintained a relationship after the killing, though not seeing each other as frequently as before. Then, at the end of November 1983, appellant moved to Tallahassee, and from that time until the arrest of both in May 1984, they maintained contact by telephone.
It is also undisputed that after the shooting, appellant gave her gun to Darrell Senn, instructing him to bury it. She testified at the trial that she later learned that Senn had dug it up again, so she then gave the gun to Briggs, telling him to get rid of it. Appellant explained this action by stating that she did not know what gun Cummings had been killed with, and she had denied to the police that she had a gun.
At no time did appellant inform the police that Briggs had admitted the killing, although she was fully aware that police and investigators were making inquiries concerning her and Briggs. At some undisclosed time, prior to her arrest, appellant secured the services of her present counsel, with whom she discussed information pertaining to the ongoing investigation into the death of her husband. During this time, her attorney shared with her the information, furnished to him by the prosecutor's office, that the gun used by Briggs had been found in the waters of Escambia Bay, where it had been thrown by Wilson and Briggs on their way back to Pensacola after the shooting. Appellant was also told by her attorney that the authorities could do nothing unless they found "the person who pulled the trigger."
On May 21, 1984, investigators went to Briggs' home in Pensacola, played the recorded telephone message from Cummings' home telephone answering machine, and Briggs confessed to the crime. Almost immediately, law enforcement officers arranged, with Briggs' consent, for Briggs to induce appellant to meet with him in a motel room in Tallahassee in which the officers would install audio and video recording devices, with electronic monitoring equipment set up in an adjoining room. Pursuant to this arrangement, Briggs telephoned appellant at her Tallahassee apartment at 1:30 or 2:00 A.M. on May 22, 1984, and told her that he needed to talk with her in his motel room at the Ramada Inn. Appellant *346 complied, went to the room, and the conversation later presented to the jury through audio and video tape recordings occurred.
Turning first to the alleged error in the trial court's refusal to grant a continuance, both before and during the trial, we conclude that appellant's attorney's contention that these rulings forced him to proceed with trial without having had the opportunity for adequate preparation will not bear close examination. As noted above, appellant had engaged the services of her trial counsel in advance of her arrest, was represented on the date of her arrest, at her arraignment, and throughout all subsequent proceedings. Appellant, as previously noted, was arrested on May 22, 1984. She was indicted on June 5, 1984. Her demand for discovery was filed on June 14, 1984, and the state filed a response on June 28, 1984. Discovery by appellant's attorney was not commenced until October 25, 1984, with only ten days remaining to the scheduled trial date of November 5, 1984, even though the state's response to discovery listed 41 witnesses, including the two codefendants, and also disclosed the existence of statements of the defendants, including electronic surveillance of conversations to which appellant was a party. No justification has been shown for defense counsel's failure to earlier commence investigation and preparation for trial. At arraignment on October 2, 1984, defense counsel, with the knowledge and consent of appellant, made no effort to seek a continuance, even though defense counsel had trial commitments in other cases that would demand his attention until late in October. Thus, appellant and her attorney acceded to a trial date of November 5, 1984, specifically declining, upon inquiry by the court, to waive speedy trial, the time for which expired on November 19, 1984. At a hearing, five days before the trial date, on appellant's initial motion for continuance, the trial court was advised by the state attorney that his office had been in contact with defense counsel's office repeatedly during the preceding three to four weeks, specifically inquiring whether a continuance would be requested, and each time received a response that no continuance would be sought.
Given the length of time defense counsel had represented appellant, the knowledge of the facts of the case possessed both by appellant and her counsel, as disclosed by the trial record, the admission by defense counsel that he devoted himself almost exclusively to the handling of other cases in the weeks just prior to trial, and the circumstances surrounding appellant's belated efforts to delay the trial, the conclusion is inescapable that most, if not all, of the difficulties experienced by counsel in his last-minute preparation efforts were the product both of appellant's and her counsel's own pretrial decisions, rather than any lack of diligence or improper tactics on the part of the prosecuting officials, or erroneous ruling by the trial court.
The decision to grant or deny a motion for a continuance is within the discretion of the trial court, and the court's ruling may be reversed on appeal only when it is shown that the trial judge abused his discretion. Jackson v. State, 464 So.2d 1181 (Fla. 1985), and cases therein cited. Further, while cases are legion holding that the defendant must be given an ample opportunity to prepare for trial, Brown v. State, 426 So.2d 76 (Fla. 1st DCA 1983); Harley v. State, 407 So.2d 382 (Fla. 1st DCA 1981); Lightsey v. State, 364 So.2d 72 (Fla. 2d DCA 1978); Sumbry v. State, 310 So.2d 445 (Fla. 2d DCA 1975); Hawkins v. State, 184 So.2d 486 (Fla. 1st DCA 1966), neither these nor other decisions brought to our attention address facts similar to those present in the case before us. Here, the opportunity for preparation of a defense was more than ample, and appellant has failed to demonstrate "inability" to prepare a defense as that term is used in the decisions relied upon for reversal. We find that the trial judge did not abuse his discretion in refusing appellant's eleventh-hour request for a continuance in this case. Cf., Lusk v. State, 446 So.2d 1038 (Fla. 1984).
Appellant next contends that a discovery violation under Richardson v. State, 246 So.2d 771 (Fla. 1971), occurred *347 when the state, after advising defense counsel that it "did not know" whether the state intended to use any witness from the Florida Department of Law Enforcement Crime Lab, called FDLE employee David Leroy Williams, a firearm identification expert, to testify as to the type of weapon and ammunition used in the murder. We find, contrary to appellant's assertion, that the trial judge, although expressing some doubt that a Richardson issue was presented, nevertheless conducted an inquiry, and after a conference found that the firearms expert was inadvertently left off the discovery list furnished to defense counsel. The trial judge also recessed the trial to allow defense counsel to interview or depose the witness before proceeding. It is clear that the trial court was of the opinion that the defense was not prejudiced by the state's omission. Williams' testimony was merely cumulative and corroborative of codefendant Briggs' testimony as to the type of gun he used in the shooting, and of the testimony of Briggs and witness Robert Dukes that Dukes sold Blazer ammunition to codefendant Wilson on the day of the crime. We find no reversible error occurred. See, Cooper v. State, 336 So.2d 1133 (Fla. 1976); Slaughter v. State, 301 So.2d 762 (Fla. 1974); Taylor v. State, 386 So.2d 825 (Fla. 3rd DCA 1980).
Appellant next contends that the trial court committed reversible error in allowing the jury to have access to and read a transcript of audio and video recordings of appellant's May 22, 1984, motel room meeting with codefendant Briggs while listening to the audio tape and viewing and listening to the video. On this point, appellant makes three basic arguments: (1) that it is error to allow use of such a transcript; (2) that the trial court should have barred its use in this case because a copy of the transcript was not furnished to appellant until a week before trial, and the transcript actually used at the trial was a revised version of the first transcript, copy of which was not furnished to appellant until the day it was presented to the jury; and (3) that the jury was unduly influenced by the purported written version of the conversations captured on the tapes, particularly in view of the questions raised as to the variations between versions of the transcript used.
Considering the specific arguments in the order in which they are stated above, we find that it is not per se reversible error to allow the jury to read a properly authenticated transcript of recorded conversations between the defendant and another while the recording is being played. Golden v. State, 429 So.2d 45 (Fla. 1st DCA 1983), pet. for rev. den., 431 So.2d 988 (Fla. 1983); Taylor v. State, 508 So.2d 1265 (Fla. 1st DCA 1987); Harriel v. State, 508 So.2d 509 (Fla. 4th DCA 1987). But see, Stanley v. State, 451 So.2d 897 (Fla. 4th DCA 1984), urging caution by trial courts in the use of transcripts, especially where the contents of the tape recordings are in dispute.
It is not contended here, nor could it be, that the transcript read by the jury during their viewing and listening to the audio and video tapes was not properly authenticated. The state presented the testimony of FDLE Special Agents Joe Baker, Robert G. Hinnet, and Sheila Skipper. According to their testimony, Baker, with Hinnet assisting, set up the audio and video electronic surveillance equipment in the Ramada Inn for the May 22, 1984 meeting between appellant and codefendant Briggs. Special Agent Skipper testified that she was present when Briggs was instructed to telephone appellant and ask her to come to the motel room, and that she monitored the conversations between appellant and Briggs from an adjoining room, listening to and watching by means of the equipment set up by Baker and Hinnet. She further stated that the conversations recorded on the audio and video tapes represent what she saw and heard that evening; and that the transcript presented for reading by the jury accurately represents the recording of the voices in the room that evening. Briggs was recalled to testify that the recordings were made with his prior consent. The trial court ruled that the transcript, as well as the audio and video tapes, had been properly authenticated, and that the tapes would be allowed into evidence. As to the transcript, the court ruled that it could be *348 used by the jury, as the court instructed the jury, "only as an aid to your understanding and viewing" during the playing of the tapes, but the transcript would not be allowed to be taken by them into the jury room.[1] We find no error in these rulings.
Turning to the issue of late disclosure of the transcript, we observe, at the outset, that the tape recordings, not the transcript, were admitted as evidence. The existence of the electronic surveillance tapes was disclosed by the state in its response to discovery demand served on June 28, 1984, more than four months prior to trial. These recordings were continuously available for hearing or viewing by defense counsel, and there is no contention that demands for production were made and refused. The record does indicate that a request for a copy of the tapes was made prior to trial, and a copy was furnished by the state a week to ten days before trial. We find it difficult to determine when the request for a copy of the tapes was first made, but at the continuance hearing just five days prior to trial, defense counsel denied that he was contending that the state procrastinated in providing the copy of the tapes, and assured the court that he was "not saying that they [the prosecuting attorneys] refused to give me anything," and further: "I think they have acted in good faith and I would like to think they think I have also."
Since the tapes, not the transcript, were admitted into evidence, appellant's contention on appeal that use of the transcript as a trial aid because of late delivery was precluded by Rule 3.220, Florida Rules of Criminal Procedure, is not well taken. The resolution of this issue by the trial judge was therefore a matter within the sound judicial discretion of the trial court to rule on the admissibility of evidence (here an aid to the reception and understanding of evidence) and control the proceedings, and his decision to allow use of the transcript is not reversible absent a showing of abuse of discretion. See, King v. State, 514 So.2d 354 (Fla. 1987); Jent v. State, 408 So.2d 1024 (Fla. 1981); Feeney v. State, 359 So.2d 569 (Fla. 1st DCA 1978).
Before ruling on the use of the transcript, the trial judge heard a proffer of all evidence concerning the making of the tape recordings, and testimony of Agent Skipper authenticating the recordings and the transcript. The court also ordered a playing of the audio and showing of the video tapes outside the presence of the jury at which counsel and the court compared the recordings with the written transcript of the conversations heard on them. The trial judge specifically stated that the viewing would be for the purpose of determining the accuracy of the transcript, and to determine if there were "major variations" between it and the copy initially submitted to defense counsel before trial. During the conference between the court and counsel regarding the transcript, the state attorney informed the court that at the time the initial draft of the transcript was delivered to defense counsel, he was advised that the state was still working to "update" the draft, and that continuous efforts were made to make it as accurate as possible by using better equipment. Agent Skipper testified that the transcript had been prepared by the state attorney's office, and that she had listened to and viewed the video tape that day and made a word-forword comparison of the transcript to the tape. Although not a part of the colloquy preceding the introduction of the tape, later testimony of Investigator Donald Milton, of the state attorney's office, established that he prepared the initial draft (the one furnished to counsel before trial), and that he made certain corrections during multiple playings of the tape; and that his draft was then submitted to Agent Skipper, who made the final corrections, and that the ultimate product of the transcript submitted at the trial, was hers.
*349 Appellant, in her brief, directs our attention to five specific portions of the written transcript purporting to show discrepancies between the first (Defendant's Exhibit "1") and the second (Defendant's Exhibit "2") drafts of the transcript.[2] In order to assess the significance, if any, of these changes, they must be considered in the context of the conversation being conducted by appellant and Briggs as revealed by the remainder of the transcript. The conversation opens with appellant's question whether Briggs had been contacted, to which he replied in the affirmative, stating that was why he was there, and that he had to have some money. Further inquiries by appellant elicited Briggs' declaration: "I'm going to hide my ass out for a while." Further, that the officers had come to his house that afternoon, and "asked me so damn many questions." He named the officers, and related to appellant that they had asked about his relationship with appellant, asked things about Buddy (the victim), and that "they played that God damned tape." Appellant asked: "What tape?" To which Briggs replied: "That tape out of that God damn recording machine." He then repeated that he was speaking of the tape on Buddy's recorder; that he was scared they were coming after him; that he was afraid to stay around and that he had to have some money so that he could disappear. Appellant then asked: "What did you do with the gun?" "Can they connect you with it?" Briggs answered that they had found no gun, to which appellant responded that her attorney had informed her that a gun had been found, but that it was all covered with mud and it was doubtful they could get a ballistics check on the gun. Appellant then asked Briggs what he had been asked about the recording, and whether they said it was his voice, to which Briggs answered in the affirmative and repeated that he was going to need some money, $2,000 or $3,000. Appellant asked whether this was "just going to make it look even worse?" And she further indicated that eventually the FBI would find him. Briggs stated that he had never done anything like this before that it was horrible, and: "I can't live with myself." Appellant asked if he had been followed, and Briggs asked what else appellant's attorney had had to say, which elicited appellant's response: "Ron says that unless they find the person who pulled the trigger, they can't do anything." Appellant told Briggs that he could not get in touch with her, that her phone had been bugged the whole week, which Briggs said that he knew, and that's why he asked her to come to the motel. At this point in the transcript appears the first disputed portion urged by appellant.
Defendant's Exhibit "1":
Loren: Like what?
Briggs: (Inaudible whisper).
Loren: (Inaudible whisper).
Briggs: About the gun?
Loren: About the gun.
Briggs: No. Uh-uh (negative). That never came up. (Sigh) (Pause).
Loren: (Inaudible whisper). Did you wipe off the gun? [In handwriting].[*]
Briggs: If it's covered with rust they're not gonna have nothing on it anyway.
[*] [words in brackets are supplied by author for explanatory purposes]
Defendant's Exhibit "2":
Loren: Like what? Did they ask you about the gun.
Briggs: About the gun?
Loren: About the gun. (Inaudible mouthing).
Briggs: No. Uh-uh (negative). That never came up. (Sigh) (Pause).
Loren: Did you wipe off the gun before you threw it away?
Briggs: Yeah. But if its covered with rust they're not gonna have nothing on it anyway.
The conversation then continued, with Briggs stating that "they've got my voice," which is as "good as fingerprints," and that it was his voice setting up an appointment with Buddy for Friday afternoon. Appellant asked if he had told the officers that, to which he replied in the negative, *350 but there was no way around it, "they got my voice on that tape, Baby, and that's just as good as anything I know of." He then stated they informed him there was a witness, to which appellant responded: "That's a lie." After further discussion about going to Maryland, appellant asked: "What happens if they eventually catch you?" Briggs replied that they would charge him with first degree murder and that he would go to the electric chair. Appellant asked "was there a lot of noise in the background?" Briggs answered that it was traffic noise. Then appears the next disputed portion of the transcript:
Defendant's Exhibit "1":
Loren: What are (we) gonna do? What are we gonna do?
Briggs: I just don't know what to do. (Room phone rings).
Defendant's Exhibit "2":
Loren: I was worried about that damn recording.
Briggs: I just don't know what to do. (Room phone rings).
Loren: Were you expecting somebody?
Briggs: No. Nobody. [Last Loren and Briggs exchange is written in handwriting on Exhibit "2"].
The above complete change in the wording of the two transcripts was explained by Investigator Milton. He stated that he included the words "What are we gonna do?", shown in Defendant's Exhibit "1", in his working draft, but upon further listening, it was found to be an incorrect statement. As for the statement appearing in its place in Exhibit "2", "I was worried about the damn recording," Milton explained that Agent Skipper called his attention to the existence of that wording and instructed him to add it to Exhibit "2", which he did in his handwriting.
Continuing with summary of the conversations, the transcript reveals that Briggs answered the phone, said hello, and stated "nobody here by that name." He then hung up the telephone and stated "wrong number." Appellant's response was: "I don't believe that." Appellant wanted to know who they had asked for, and did he think he had been followed. She stated: "I don't like that phone call." She informed him that she would get the money he wanted from her mother, but had to figure out what she was going to tell her; she also asked what he would do for money if he was gone, observing also "you're on probation." She also stated that he should get out of the country. At that point there was plumbing noise from an adjoining apartment, to which appellant reacted: "I'm so scared." The next disputed portion appears as follows:
Defendant's Exhibit "1":
Loren: (Crying) I didn't know anything about the recording.
Briggs: I know about it now. I know about it now. It was all I could keep from doing from falling out that chair when they played that tape thing.
Defendant's Exhibit "2":
Loren: (Unintelligible) anything about the recording.
Briggs: I know about it now. I know about it now. It was all I could keep from doing from falling out that chair when they played that tape thing.
After further discussion about the recording, appellant repeated: "I'm scared." And, "why did they wait all this length of time? Why did they wait all this length of time?" Briggs responded he did not know, but they told him they checked out 2,000 brown, Aries K's (the car rented by Briggs) and only found one that was rented that day to him. When Briggs again confirmed that was the car he had rented, appellant said: "Well, they gotcha." Then the next disputed portion of the transcript appears:
Defendant's Exhibit "1":
Loren: If you get caught (inaudible whisper). "I'm caught, huh?" [Last question in handwriting above "inaudible whisper"].
Briggs: Huh.
Loren: If you get caught (inaudible whisper) (the words "I'm caught, huh?" above "inaudible whisper" in handwriting).
Briggs: Well, I told you I was gonna keep my mouth shut.

*351 Loren: I hate to say that, but I got to think about my kids.
Briggs: I know you got your kids baby. I told you that but I got to have my help. It's jus ... It's just ... It's going too bad. I've got to try to get out of here and regroup and then try to ...
Defendant's Exhibit "2"
Loren: If you get caught, I'm caught. Huh?
Briggs: Huh?
Loren: If you get caught, I'm caught. Huh?
Briggs: Well, I told you I was gonna keep my mouth shut.
Loren: I hate to say that, but I got to think about my kids.
Briggs: I know you got your kids, baby. I told you that but I got to have my help. It's jus ... It's just ... It's going too bad. I've got to try to get out of here and regroup and then try to ...
Briggs then talked about disappearing into Canada or Mexico, and appellant stated: "And I can't run." Appellant then said: "I almost want to kill myself." Briggs responded he had no choice (apparently but to leave). Then appellant stated she was not going to "give it to you with my hand." This referred to the money he was seeking, and Briggs stated that she could call it repairs or whatever, but that he just had to have the cash. Appellant then asked: "Would you promise me something?" "Would you promise me if ... if they do catch you, you won't mention me?" To which Briggs responded: "No, baby. I won't say a word." Appellant explained that she did not know what to do about her kids. Then there was further conversation about her having to get the money from her mother; that her phone was bugged; then appellant exclaimed something about three trucks pulling over behind her like they were checking something (apparently on her way to the motel). She then indicated that she would leave the money in the ladies restroom of a service station next to the Days Inn on Highway 27. She described the location of the service station exactly to Briggs, and stated that it would be under the toilet in the ladies bathroom. Appellant then extracted a promise from Briggs that if they caught him "you won't say anything." He again indicated in the negative. She wanted to know then how he would change his identity. She asked if $3,000 would be enough, requested that he keep in touch with her, and repeated that she was scared. She also mentioned then that some person had seen her come through the lobby. (On defendant's Exhibit "1", this is not mentioned; in its place is "inaudible whisper" several times.) Appellant then asked what the children had said to the officers, to which he replied "nothing," and then she observed: "They have the car and the recorder." Then the two, parting, exchanged the words: "I love you."
From the above somewhat tediously drawn out examination of the initial and final drafts of the transcript, it is patently obvious that while there are some instances of variation in the language, and words are supplied in the place of "inaudible," or "unintelligible," as found in the initial draft, the tenor and effect of the conversation between appellant and Briggs as depicted by the two versions remains the same.[3]
Furthermore, the record discloses that the state offered, with the trial court's *352 approval, to submit Defendant's Exhibit "1" to the jury also, so that a comparison of any divergences could be directly considered by the jury. This offer was declined by appellant, thereby waiving the right to have the particular objections voiced by appellant resolved by the jury as a problem of fact "in the traditional manner", one of the suggested procedures discussed by the court in United States v. Onori, 535 F.2d 938 (5th Cir.1976).
We conclude that the objections concerning discrepancies in the transcript used are properly viewed as matters bearing on the issue of authentication. Here, although the transcript was not admitted as evidence, the authentication of the transcript conformed to the rule for authentication for use as evidence, section 90.901, Florida Evidence Code, and an abuse of discretion by the trial judge in denying objections to use of the transcript based upon alleged inaccuracies or discrepancies has not been demonstrated. Cf., Justus v. State, 438 So.2d 358, 365 (Fla. 1983) (under evidence code, section 90.901, Florida Statutes (1981), the trial judge must evaluate each instance on its own merits, there being no specific list of requirements for such determination, and unless "clearly erroneous," the trial court's determination of matters relating to authenticity must stand); Allen v. State, 492 So.2d 802 (Fla. 1st DCA 1986).
In support of her contention that the jury was improperly influenced by the use of the transcript, appellant relies in part upon the court reporter's observations (as established by notes made by the reporter during the playing of the tapes) as to the juror's actions indicating the percentage of time they spent looking at the transcript, or looking at the video tape. According to the reporter, four of the twelve jurors divided their time unevenly, devoting far more attention to the transcript than to the video. All the others divided their time about fifty-fifty. We do not agree that undue resort to the transcript has been demonstrated. Having viewed the video, we observe that there was in fact little for the jury to see on the television screen after the two participants entered the room and began their conversation, since during the entire episode appellant remained seated in one position in a chair, and Briggs remained seated on the bed, except for one occasion when he got up to answer the telephone and another occasion when both moved out of the view of the camera. The primary facts to be observed from the video, therefore, were the identity of the participants in the scene portrayed, their position in the room with relation to each other, and any gestures or other body movements accompanying their spoken words. All of these actions, it appears to us, are readily observed and monitored by brief, intermittent glances at the screen. There were no close-ups of facial expressions. Although we must agree that the tape recordings are difficult to understand in their entirety, appellant does not contend on appeal that they were so inaudible or unintelligible as to be inadmissible,[4] and we find that appellant has not demonstrated undue reliance on the transcript, as opposed to the audio and video reproductions of the conversations.
Finally, appellant complains of the trial court's failure, at a hearing after trial commenced, to order the witnesses, Darrell Senn, Steve Carden, and Steve Simons, to reveal their present places of residence. The deposition of these witnesses, all of whom testified at trial, were taken by appellant either just prior to trial (Darrell Senn), or during trial (Carden and Simons). The trial court granted a motion in limine on behalf of the state prohibiting appellant's counsel from requiring disclosure of their places of residence either in depositions or in their testimony at trial, on the *353 representation by the state that the witnesses were concerned for their safety. We agree with appellant that an adequate factual basis was not presented as justification for an order of nondisclosure, since there was no proof of actual, as opposed to implied threats to their safety, and the state failed to disclose to the judge, in camera, the information sought to be withheld. See State v. Hassberger, 350 So.2d 1 (Fla. 1977) (adopting the "personal safety" exception to the state's duty of disclosure, and approving the procedure for in camera disclosures as outlined in United States v. Palermo, 410 F.2d 468 (7th Cir.1969)). However, we agree with appellee that no contention is made that these witnesses were withheld from appellant's counsel at any time, or that he was prevented from deposing them; nor does appellant demonstrate in what manner their present place of residence would have been used to attack their "credibility," since the record demonstrates appellants' thorough familiarity with these witnesses, and their places of residence prior to, during, and subsequent to the murder in question. Any error in the court's ruling on this issue, we conclude, as appellee urges, was harmless. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986); Tumulty v. State, 489 So.2d 150 (Fla. 4th DCA 1986), rev. den., 496 So.2d 144 (Fla. 1986).
We have considered and find no error in the remaining arguments presented by appellant. The judgment of conviction and sentence appealed is therefore,
AFFIRMED.
WENTWORTH, J., concurs.
BARFIELD, J., concurs and dissents with written opinion.
BARFIELD, Judge, concurring and dissenting:
I concur in affirming the conviction, but disagree that the trial judge committed no error in allowing the jury to see and read a transcript of a videotaped conversation. In this case, I am convinced this was harmless error.
I adhere to my opinion in Taylor v. State, 508 So.2d 1265 (Fla. 1st DCA 1987), and suggest that the majority has further misapplied and misconstrued section 90.901, Florida Statutes (1983). There is no question in this case that the transcript is really the transcript (authentic). The issue is whether the transcript is accurate and, if accurate, is admissible in light of hearsay objections and the best evidence rule.
NOTES
[1] The court's instruction was apparently given in response to defense counsel's request, out of the presence of the jury, that the jury be instructed that the transcript was not evidence. No objection was made to the court's phrasing of the instruction, and no request for correction or further instruction was made.
[2] By our count, there were some 133 exchanges of question (or statement) and response between appellant and codefendant Briggs during the recorded conversations.
[3] Indeed, with exception of appellant's categorical denial of a few incriminating statements, focused primarily on her denial that she knew of Briggs' voice being on the victim's recording machine before she went to the motel that night, her version of what was discussed in the motel room is highly consistent with what appears on the transcript. Furthermore, there is a noticeable absence of any denial whatever on appellant's part of the most incriminating portions of the statement, her acknowledgment that if Briggs was caught, she was caught; that she couldn't run because she had to think about her kids; and her extraction of his promise that if caught, he wouldn't mention her. The undenied circumstances  her late night meeting with the professed murderer of her husband, her agreement to surreptitiously furnish funds for his getaway, and her departure from this meeting, not to the nearest law enforcement agency, but to the airport where she was arrested just before boarding a plane to travel to Pensacola to see her attorney  all lend further weight to the more directly incriminating statements.
[4] Florida courts have followed the general rule that such recordings are admissible unless the inaudible and unintelligible portions are so substantial as to deprive the remainder of relevance; and partial inaudibility or unintelligibility is not a ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible. Odom v. State, 403 So.2d 936 (Fla. 1981); Golden v. State, supra; Steinbrecher v. State, 409 So.2d 510 (Fla. 3rd DCA 1982); Gomien v. State, 172 So.2d 511 (Fla. 3rd DCA 1965); Matheson v. State, 468 So.2d 1011 (Fla. 4th DCA 1985).