306 So.2d 167 (1974)
Frederick DORNAU, Appellant,
v.
STATE of Florida, Appellee.
No. 71-615.
District Court of Appeal of Florida, Second District.
January 23, 1974.
Rehearing Denied January 30, 1975.
Raymond E. LaPorte of Ragano & LaPorte, Tampa, for appellant.
*168 Robert L. Shevin, Atty. Gen., Tallahassee, Michael M. Corin, Asst. Atty. Gen., and H. Tucker Cotten, Legal Intern, Tallahassee, for appellee.
McNULTY, Judge.
Appellant Dornau appeals his conviction of first degree murder in the shooting death of one Mabel Holmes, who was employed as a maid in the home of a prominent Sarasota banker named Addy. We affirm.
The murder occurred in the employer's home while members of the household were out. Evidence was introduced showing that appellant had previously sought to borrow $200,000 from Mr. Addy's bank; and it was, and is, the theory of the state's case that Mabel Holmes was murdered so that appellant could subsequently extort $200,000 from Mr. Addy personally. The murder, it is said, was the first step in the scheme; and it was committed so that appellant could demonstrate, by alluding thereto, the seriousness of the threats he intended subsequently to make in the extortion attempt.
During trial several extortion notes were produced, all of which were sent after the murder and some of which, consistently with the state's theory, obtusely referred to the murder in terms calculated to generate fear of a like fate if the terms of the extortionist were not met.[1] Certain of these notes were found at designated phone booths pursuant to instructions from the extortionist. In an attempt to connect appellant to these extortion notes the state, over objection, introduced two overtime parking tickets which were placed on appellant's car in a metered parking space located near a phone booth in which, on the same day such parking tickets were issued, one of the extortion notes was found. The tickets became ostensibly important in the case because no other evidence tends to place appellant personally at the scenes where any of the extortion notes were found, although there is considerable evidence otherwise connecting appellant to the notes and to the murder itself, as will hereinafter appear.
The tickets were objected to as aforesaid on the grounds that they were illegally found and seized in violation of appellant's Fourth Amendment rights; and, indeed, they had been suppressed on motion prior to trial. Their introduction at trial, however, was during the state's case in rebuttal; and herein lies the basis for the one point on appeal meriting discussion.
Appellant had taken the stand in his case in chief but limited his testimony to the day of the murder and to preceding events. None of appellant's testimony concerned his activities subsequent to the murder, which is the period of time during which the state contends the extortion efforts were made and to which the parking tickets related. It is clear, therefore, that the tickets were not properly the subject of cross-examination, not being within the *169 scope of anything testified to on direct, and, for the same reason, were not properly in rebuttal or contradiction of anything. Accordingly, the state could not rely on the "rebuttal" concept to accomplish indirectly that which the exclusionary rule prohibits it from doing directly. But the error is harmless, as will hereinafter appear.
For now, however, we think the "rebuttal" concept upon which the state relies merits further exploration in the interest of the proper administration of criminal justice. To begin with, we observe that the precise factual structure with which we are here concerned has never been considered in the rebuttal context by the Florida courts. True it is that recently our Supreme Court in State v. Retherford[2] followed Harris v. New York[3] and permitted the use in rebuttal of a confession previously suppressed pursuant to the discipline of Miranda v. Arizona.[4] But the Fifth and Sixth Amendment[5] rights were involved in Miranda, while here we are concerned with a violation of a Fourth Amendment[6] right. If, however, there is a difference between the principles laid down in Retherford relating to the admissibility in rebuttal of statements taken in violation of Miranda and those relating to the admissibility in rebuttal of illegally seized evidence we fail to perceive it. In any case, while the Florida courts have not dealt with our factual situation, the United States Supreme Court has. In Walder v. United States,[7] the defendant took the stand and, on direct examination, stated that "he had never sold any narcotics to anyone and had never even possessed any narcotics." In rebuttal the prosecution was permitted to present evidence that the defendant had previously been found in possession of narcotics, although he was so previously found pursuant to an illegal search. The Supreme Court held that such evidence was properly admitted for the purpose of impeachment. The court said:[8]
"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths... .
... there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."
We agree, and see no reason why these principles ought not obtain in Florida. We say this with full awareness of the revised Florida constitutional provisions relating to the right against illegal searches and seizures.[9] Section 12 of the Declaration of Rights, F.S.A., now contains the proviso that "... articles or information obtained in violation of this right (i.e., against illegal searches and seizures) shall not be admissible in evidence" (Italics supplied). But we are of the view that this language was intended merely to incorporate expressly the exclusionary rule first promulgated in Weeks v. United States[10] and made binding on the states in Mapp v. *170 Ohio.[11] Certainly, we think, there was no intent to enlarge the exclusionary rule.
We are of the view, too, that such incorporation of the exclusionary rule must necessarily include all judicial expression and interpretation of the rule existing at the time the constitution was revised, and this would include the "rebuttal" exception enunciated in Walder, supra. Illegally seized evidence may be used by the state, therefore, either within the scope of proper cross-examination or in proper rebuttal.
But having determined, as we have, that the facts here are not within Walder we find that they fall more closely within the ambit of Agnello v. United States.[12] In Agnello, as here, the illegally seized evidence purportedly introduced in rebuttal did not really rebut or contradict anything to which the defendant had previously testified. For this reason it was held improperly admitted. That holding is not, of course, inconsistent with the principles relied upon in Harris or Retherford, supra, wherein illegally obtained confessions were properly admitted in rebuttal when they actually contradicted the defendants' direct testimony in their case in chief. So, we think, Agnello controls here. The remaining question, then is whether the error thus demonstrated is reversible. We think not.
We have already alluded to the state's theory of motive for the murder, viz., that appellant killed Mabel Holmes as part of a scheme to extort $200,000 from the banker Addy. We noted, too, that another part of that purported scheme consisted of a series of extortion notes calculated to create the fear thought necessary to accomplish the extortion. Now we point out that even though the obvious purpose for the introduction of the challenged evidence, i.e., the traffic tickets, was to attempt to connect appellant to those extortion notes by placing him at or near a phone booth at approximately the time one such note was found therein, in order to evaluate the prejudicial effect of the traffic tickets we must consider them not only in the motive context but also vis a vis the other evidence in the case pointing to appellant as the killer.
Doing this, we find that although there was conflict on some points there was competent evidence from which the jury could, and obviously did, find the following: (1) Appellant's business, Raydor Industries, had gone bankrupt and appellant was personally heavily in debt, although he still maintained a high standard of living including the rental of a beachfront Siesta Key house at $475 per month. (2) Appellant had unsuccessfully attempted to borrow $200,000 from the bank through Mr. Addy (the amount sought to be extorted, it will be recalled, was also $200,000). (3) A workman on a road construction crew near the Addy residence had seen appellant driving by on the two days immediately preceding the murder. (4) On the murder day, the workman saw appellant park a car and approach the garage of the Addy's residence carrying what appeared to be a shoebox. This occurred "sometime after lunch," and it is significant to note that the car described by the workman as having been driven by appellant on that day was a different car than that observed on the two preceding days. Its significance lies in the fact that it was also shown that on the murder day appellant had rented a car of the same make, model and color as the one last described by the workman who had no way of knowing otherwise the make and color of the car appellant had rented for the one day or, for that matter, that appellant might have had access to a second car of like description at all. (5) *171 The victim, Mabel Holmes, was alone in the Addy residence on the day she was murdered and was last seen alive by the postman around 1:25 p.m. The time of her death was put between noon and 2:30 p.m. by a physician (i.e., "some time after lunch"). (6) The victim was shot with a .25 caliber pistol. (7) Appellant owned a.25 caliber pistol with which he had practiced in an open space behind his business (Raydor Industries); and shell casings found in the rear of his business matched a shell casing found on the floor of the Addy home after the murder. Too, while no gun was produced, ballistics established that the casing found at the murder scene was fired from the same gun that discharged several of the .25 caliber casings found in the rear of the aforesaid business. (8) Stationery used in the extortion notes matched stationery seized from appellant's house. (9) Appellant's fingerprints were found on two of the notes. (10) The handwriting of one such note matched that of known samples of appellant's handwriting. (The other notes were stenciled and no comparisions were possible.) (11) Finally, the drop-off point designated by the extortionist for delivery of the demanded $200,000 was across the street from appellant's rented house on Siesta Key.
Obviously, in the face of the foregoing, the challenged parking tickets fade almost into total obscurity. They tend to show only that appellant's car, not appellant nor, indeed, the car seen on the murder day, had been in a certain area of Tampa on a relevant subsequent date. If true, this was merely corroboration of the lowest order. Moreover, the effect of such evidence was further diluted by the testimony of appellant's wife who stated that she had occasionally taken the car to that area of Tampa on shopping trips during that general time of year. In sum, and in light of the totality of the state's case against appellant which we deem overwhelming, and only partially outlined above, we unhesitatingly conclude that beyond doubt the admission of the parking tickets was harmless error.[13]
Accordingly, the judgment and sentence appealed from should be, and they are hereby, affirmed.
MANN, C.J., and HOBSON, J., concur.
NOTES
[1] One typical note, sent to a Father Fitzgerald of the Church of Redeemer in Sarasota, who interceded as an intermediary with the consent of the extortionist, reads as follows: "THIS IS WRITTEN ON 2 ASSUMPTIONS. 1. YOU HAVE 200.000. AND WANT TO PAY. 2. POLICE PROTECTION WAS FORCED ON YOU AND YOUR DECLARATION OF SECRECY HOLDS TRUE. IF EITHER IS WRONG YOU MADE A MISTAKE BECOMMING AN INTERMEDIATE. NOT ONLY WILL WE KILL ADDY, BUT WE WILL PLACE A BOMB IN YOUR CHURCH AND EXPLODE IT FOR A SUNDAY SERVICE. KILLING THE MAID WAS A WARNING AND DEMAND, FAILURE ON YOUR PART WILL BE REVENGE ON OURS. ASSUMING YOUR EFFORTS ARE SINCERE: YOU WILL DO AS FOLLOWS  FRIDAY 22 AT 9 PM GO TO PHONE BOOTHS NEXT TO "WOLFIES" PUB" OFF 19 IN ST. PETE, AND WAIT BY THE PHONE UNTILL CONTACTED. PREPARE FOR A LONG NIGHT. THIS TIME NO ESCORT (YOU IN NO DANGER). ADDY'S DEATH AND PART OF YOUR CONGREGATION WILL REST ON YOU. ASSISTANCE FROM YOUR ENEPT POLICE WILL END ALL. THIS IS THE LAST DEMAND." (Italics ours)
[2] (Fla. 1972), 270 So.2d 363.
[3] (1971), 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1.
[4] (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[5] Constitution of the United States.
[6] Id.
[7] (1954), 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503. Also, California followed Walder in People v. Taylor (Cal. 1972), 8 Cal.3d 174, 104 Cal. Rptr. 350, 501 P.2d 918, in which a copious discussion of the principles involved may be found.
[8] Id. 347 U.S. at 65, 71 S.Ct. at 356, 98 L.Ed. at 507.
[9] As adopted November 5, 1968.
[10] (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.
[11] (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. See, also, commentary to the 1968 revision, Florida Constitution, 25A F.S.A. at p. 269.
[12] (1925), 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.
[13] Cf., Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; and Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.