NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

LAZARO GUTIERREZ-HERNANDEZ,     )
                                )
          Appellant.            )
                                )
v.                              )     Case No. 2D15-3342
                                )
STATE OF FLORIDA,               )
                                )
          Appellee.             )
                                )

Opinion filed July 14, 2017.

Appeal from the Circuit Court for Polk
County; Jalal Harb, Judge.

Valerie Jonas and Beth Weitzner of
Weitzner & Jonas, P.A., Miami, for
Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Lisa Martin, Assistant
Attorney General, Tampa, for Appellee.


LUCAS, Judge.

        Lazaro Gutierrez-Hernandez owned a house in Poinciana with a

marijuana grow room inside of it.  At his jury trial on charges of trafficking in cannabis,

possession of a structure used for trafficking, manufacture of cannabis, and possession

of drug paraphernalia, he claimed to know nothing whatsoever about the thirty-seven

marijuana plants that were being cultivated inside of a partially sealed room of the house. Mr. Hernandez's defense was that his house was merely an investment property, a place where he let his sister temporarily reside, and that he had no access or control over the grow room inside of it. Unfortunately for Mr. Hernandez, the jury was presented with unlawfully obtained evidence that made his claim all but untenable. Accordingly, we reverse his convictions and sentences.[1]

I.

After learning of an illegal "tap"[2] providing electricity to a house in Poinciana, Florida, that belonged to Mr. Hernandez (who was already suspected of operating a marijuana grow house near Kissimmee), Polk County Sheriff's Detective Omar Saenz applied for a search warrant of the property. As it happened, while Detective Saenz was en route with an executed search warrant for the Poinciana house, he saw Mr. Hernandez and his sister, Yureikis Hernandez, in a white Nissan beginning to pull into the house's driveway.[3] Other detectives who had secured the property attempted to approach the car, but the Nissan changed direction and sped down the roadway. Detective Saenz followed the vehicle until it stopped approximately

---

[1]Mr. Hernandez was sentenced to concurrent ten-year prison terms on the trafficking and possession of a structure used for trafficking counts, a concurrent five-year term in prison on the manufacture of cannabis count, and time served on the possession of drug paraphernalia count.

[2]According to the testimony presented at the suppression hearing, a tap is a term used to identify any device that reroutes electrical service to bypass a utility's meter box, the effect of which is that the meter box will not register the property's actual consumption of electricity. Taps are often used to conceal the relatively large amounts of electricity that marijuana cultivation requires.

[3]The testimony was unclear as to who was driving the vehicle, Mr. Hernandez or his sister.

a block away, and then, for reasons that are not entirely clear, the detective placed Mr. Hernandez under arrest and returned him, handcuffed, to the house where he then read the warrant to Mr. Hernandez.[4]  Ms. Hernandez was also placed in custody.  While under arrest for a yet-to-be-determined offense (presumably resulting from the yet-to-be-searched house), Mr. Hernandez stated that the bedroom inside of the house belonged to him.  Detectives uncovered on Mr. Hernandez's person a key to the Poinciana house and a driver's license that listed the house's address.  At around the time of Mr. Hernandez's arrest, Ms. Hernandez, who later pleaded to a misdemeanor for her involvement in this case, also made statements to Detective Saenz suggesting that the bedroom inside of the house was being used by Mr. Hernandez.

The ensuing search of the Poinciana house revealed a one-bedroom interior with a kitchen and living room.  The bedroom held two mattresses and some men's clothing.  In the northeastern corner of the house, however, was a room with two means of ingress: a door through the living room that had been sealed shut and an unlocked door through the bathroom which could be secured by a deadbolt.  The bathroom, in turn, was next to the bedroom that Mr. Hernandez stated belonged to him.  Upon breaking down the sealed living room door, the detectives' search revealed what was unquestionably a marijuana grow room, complete with an irrigation system, high-intensity lighting, a portable air conditioning unit and fan, and thirty-seven marijuana plants that measured between six and eight feet in height.  Mr. Hernandez was then charged by information with the four counts at issue here.

---

[4]The State never contended that Mr. Hernandez was attempting to either thwart the execution of the warrant or conceal or destroy any evidence.

The circuit court, however, determined that Mr. Hernandez had been improperly arrested under the Supreme Court's decision in Bailey v. United States, 133 S. Ct. 1031 (2013), and suppressed the statements Mr. Hernandez had made to the detective.[5]  The defense failed to mention the seized driver's license and house key in its argument during that hearing.  However, shortly before the trial commenced, Mr. Hernandez made a motion in limine to clarify that the court's prior suppression order should also encompass the seizure of Mr. Hernandez's key and driver's license.  Only this time, apparently frustrated that the defense waited until the Friday before trial to raise the issue, the court apparently denied the motion.[6]  The case against Mr. Hernandez proceeded to trial, and, during its case-in-chief, the State was allowed to introduce the house key and driver's license seized when Mr. Hernandez had been unlawfully arrested.

It was a case, as the prosecuting attorney informed the jury, which hinged upon whether Mr. Hernandez had constructive possession of the grow room.  Besides Mr. Hernandez's ownership of the Poinciana house (a fact that was undisputed) and the men's clothing inside the bedroom, the State presented evidence that Mr. Hernandez had once been briefly observed exiting the garage to perform some yardwork.  The State also introduced a certified Department of Highway Safety and Motor Vehicles record that showed the Poinciana house as Mr. Hernandez's primary residence, mail addressed to Mr. Hernandez at the Poinciana house's address, a pay stub belonging to

---

[5]The State did not appeal the circuit court's suppression order.

[6]The circuit court never explicitly denied Mr. Hernandez's motion in limine. However, at the end of jury selection, the State asked if the key and driver's license were admissible, and the circuit court confirmed that they were.

- 4 -

Mr. Hernandez that was found in the Poinciana house, and, of course, the driver's license and key.

Mr. Hernandez elected not to testify. His defense was that he did not have constructive possession over the grow room because he did not live in the house; he was simply letting his sister stay there while she went through a divorce. Mr. Hernandez's counsel pointed out throughout the trial that the men's clothes found inside the room could have belonged to anyone and that subsequent testing did not reveal Mr. Hernandez's fingerprints or DNA in the grow room. The State's remaining evidence, his lawyer argued, showed only that Mr. Hernandez owned the house—which, again, was a fact he conceded. In short, according to the defense's argument throughout the trial, the State's evidence failed to prove beyond a reasonable doubt that he was aware of the grow room, much less in operative possession of it.

The State's case, however, received a lift when the evidence the circuit court previously excluded was later allowed to be introduced—through Detective Saenz. During cross-examination, Detective Saenz admitted that he did not know whether Mr. Hernandez was ever in the grow room or if he used the house as his primary residence; but then the following exchange occurred:

> Defense Counsel: Okay. And with respect to all of your investigation, is there any evidence whatsoever in terms of testimony or — or anybody ever even seeing him inside the house?
>
> Detective: No.
>
> Defense Counsel: And so when you say the defendant's bedroom, that's something you are assuming, right?
>
> Detective: Not necessarily, sir.

Construing that exchange as "opening the door," and over the defense's objection, the circuit court permitted Detective Saenz to later relay Mr. Hernandez's statement that the bedroom belonged to him.

After the State rested, the defense re-called Detective Saenz. During direct examination, defense counsel questioned Detective Saenz about the means and scope of his investigation.

> Defense Counsel: Have you ever considered the possibility that somebody else is responsible for that grow room other than the people that you arrested, my client and his sister?
>
> Detective: No, sir.
>
> Defense Counsel: Didn't even consider it?
>
> Detective: No, sir.

The circuit court deemed this as another door opening, and, over defense counsel's objection, allowed Detective Saenz to testify on cross-examination that, at the time of her arrest, Ms. Hernandez told him that Mr. Hernandez had instructed her to sleep in the living room and never explore the rest of the residence. It should be noted that Ms. Hernandez was present in the courtroom—as she had been throughout most of the trial proceedings—at the time her statement was elicited through Detective Saenz. When the circuit court inquired why the State did not simply call Ms. Hernandez to testify, the State responded that it did not wish to call a witness who had traveled from Miami to support her brother and who "would be motivated to protect her brother and not put him in prison." Indeed, the State went so far as to speculate, "[s]he could even potentially get up there and say it [the marijuana] was all hers."

The jury returned a guilty verdict as to all of the counts against Mr. Hernandez, and this appeal followed.

II.

Mr. Hernandez raises five points on appeal.  We find merit in two of his arguments.  The circuit court erred by allowing Mr. Hernandez's inculpatory statement, as well as the hearsay statement attributed to Mr. Hernandez's sister, into evidence for the reasons we will explain below.

We review a circuit court's evidentiary rulings for an abuse of discretion, a standard that may be met where the circuit court's ruling either "is based on an 'erroneous view of the law or on a clearly erroneous assessment of the evidence.' "  See McDuffie v. State, 970 So. 2d 312, 326 (Fla. 2007) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990)).  The State has never challenged that Mr. Hernandez's statement to Detective Saenz about his ownership of the bedroom resulted from his unlawful arrest.  The circuit court's initial decision to suppress his statement was eminently correct.  See Bailey, 133 S. Ct. at 1042.  The first question before us, then, becomes quite discrete: did the defense's questioning of Detective Saenz open the door so that what had been plainly inadmissible before the trial commenced became admissible after defense counsel posed a question to the detective?

"[T]he concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted."  Rodriguez v. State, 753 So. 2d 29, 42 (Fla. 2000) (quoting Tompkins v. State, 502 So. 2d 415, 419 (Fla. 1986)).  It is an evidentiary rule founded in the common law that is premised "on considerations of fairness and the truth-seeking function of a

- 7 -

trial." Bozeman v. State, 698 So. 2d 629, 631 (Fla. 4th DCA 1997). A precise formulary for how hard a particular question or response must push against a particular threshold of fairness or truthfulness in order to open the door for otherwise inadmissible evidence has remained elusive, a reflection perhaps of the highly contextual nature of the inquiry.[7] We are satisfied that in this case the door should have remained shut.

In the trial below, Mr. Hernandez did not testify. He never put his credibility at issue through any witness's testimony. Thus, under the exclusionary rule, the illegally obtained statement could not have been utilized against him. See Agnello v. United States, 269 U.S. 20, 34-35 (1925) (holding that, on cross-examination, unlawfully seized evidence may not be used to impeach a defendant on collateral matters not testified to on direct examination); Dornau v. State, 306 So. 2d 167, 168-70 (Fla. 2d DCA 1974) (incorporating Agnello and noting that previously suppressed evidence of unlawfully seized parking tickets that would show a defendant's whereabouts subsequent to the date of a murder should not have been introduced to rebut the defendant's testimony, which only concerned the date of the murder and preceding events); cf. Walder v. United States, 347 U.S. 62, 65 (1954) ("It is one thing

---

[7]Cf. Golden v. State, 429 So. 2d 45, 56 (Fla. 1st DCA 1983) ("For what cross-examination is 'reasonably suggested' by any direct examination testimony depends, obviously, on the scope and content of that particular testimony in that particular case."). That said, we note that certain broad, categorical limits to the doctrine's invocation have emerged. See, e.g., Henderson v. State, 135 So. 3d 472, 476 (Fla. 2d DCA 2014) ("[T]he State must demonstrate a legitimate need to resort to such evidence to correct a false impression. Otherwise, the 'opening the door' rule threatens to become a pretext for the illegitimate use of inadmissible evidence . . . ." (quoting Redd v. State, 49 So. 3d 329, 333 (Fla. 1st DCA 2010))); Mosley v. State, 739 So. 2d 672, 676 (Fla. 4th DCA 1999) (recognizing that to open the door to evidence of a defendant's prior bad acts, "the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled" (quoting Bozeman, 698 So. 2d at 630)).

to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths."). While we question whether the relatively benign exchange here—a defense attorney suggesting that an investigating detective had made an assumption, followed by the detective responding, "not necessarily"—could even be said to have opened the door to inadmissible evidence (broadly speaking), it assuredly did not provide a doorway to introduce an *unlawfully obtained statement from the defendant* in order to bolster an investigating detective's testimony on redirect examination. Cf. Agnello, 269 U.S. at 35 ("[The defendant] did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search."); Dornau, 306 So. 2d at 170 (holding that since illegally seized evidence admitted at trial "did not really rebut or contradict anything to which the defendant had previously testified," it had been improperly admitted). Mr. Hernandez's inculpatory statements about his control over the bedroom should not have been admitted in a trial in which he never took the stand and none of his witnesses, it appears, had ever testified in a misleading or untruthful manner.

The same holds true for Ms. Hernandez's incriminating statements about Mr. Hernandez's directions to her concerning the Poinciana house. Defense counsel asked Detective Saenz only if he considered whether someone besides Mr. Hernandez or Ms. Hernandez could be responsible for the grow room, and the detective responded "No, sir." The State convinced the circuit court that Detective Saenz was permitted to

- 9 -

then recount what Ms. Hernandez had told him in order to show that he "did investigate other occupants of the house, that being specifically Yureikis Hernandez." But it was never disputed that Detective Saenz spoke with Ms. Hernandez as part of his investigation. Indeed, the question he was posed concerning his investigation included Ms. Hernandez within its ambit. While hearsay may, in some circumstances, be used to qualify or explain the scope or means of an investigation, see, e.g., Dennis v. State, 817 So. 2d 741, 751-53 (Fla. 2002), nothing about Detective Saenz's testimony required further qualification or explanation. See Redd v. State, 49 So. 3d 329, 333-34 (Fla. 1st DCA 2010) (holding that testifying officer's testimony about why a codefendant was not charged was not "misleading or so incomplete as to be unfair" such that "the door was not opened to the admission of hearsay to explain, qualify, or limit his answers"). There was simply nothing to clarify.[8]

III.

The erroneous admission of Mr. Hernandez's inculpatory statement and Ms. Hernandez's hearsay, which became focal points of the latter part of the trial and the State's closing arguments, cannot be said to have been harmless. See Redd, 49 So. 3d at 334 (holding hearsay evidence erroneously admitted under concept of "opening the door" was not harmless because the court could not "conclude beyond a

---

[8]Mr. Hernandez never raised a Sixth Amendment confrontation clause objection to the admission of Ms. Hernandez's hearsay statements against him, either at the trial or in this appeal. Otherwise, we would be troubled by the admission of her statements through the detective given that she was present throughout the trial—and the very candid representations made by the assistant state attorney who elected not to call her. See Crawford v. Washington, 541 U.S. 36, 68 (2004) (holding testimonial hearsay evidence inadmissible against criminal defendant where the declarant is available to testify and be cross-examined at trial).

- 10 -

reasonable doubt that the erroneous admission . . . did not contribute to the verdict" (citing State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986))); see also Bell v. State, 201 So. 3d 1267, 1281 (Fla. 2d DCA 2016) ("[T]he State has not met its burden of demonstrating that there [was] no reasonable possibility that the erroneous admission of [the defendant's] second statement contributed to the verdict."); President v. State, 884 So. 2d 126, 127 (Fla. 4th DCA 2004) (holding that the erroneous admission of a defendant's confession could not be deemed harmless beyond a reasonable doubt). Accordingly, we must reverse the convictions and sentences of the circuit court and remand this case for a new trial.

Having so held, we note one final point concerning the inculpatory house key and driver's license found on Mr. Hernandez's person during his unlawful arrest, to the extent that the admissibility of this evidence may present itself again as an issue in the remanded proceedings of this case. In an apparent denial of Mr. Hernandez's motion in limine, the circuit court permitted the State to introduce both of these pieces of evidence. The court offered no rationale for why this evidence had become admissible. At the hearing on Mr. Hernandez's motion in limine, the State suggested that the key and driver's license could have also been admitted under the inevitable discovery doctrine. Cf. Young v. State, 207 So. 3d 267, 269 (Fla. 2d DCA 2016) ("The inevitable discovery doctrine allows evidence obtained as the result of unconstitutional police procedure to be admitted if the evidence would ultimately have been discovered by legal means." (quoting Hatcher v. State, 834 So. 2d 314, 317-18 (Fla. 5th DCA 2003))). Certainly, that seems a plausible contention. The circuit court, however, never ruled on that precise argument. Accordingly, we express no opinion as to whether the inevitable

discovery doctrine would have permitted the introduction of the key and driver's license found on Mr. Hernandez's person.  Nothing in our holding today should be construed to suggest otherwise.  On remand, the circuit court may consider that argument if it is properly raised.

Reversed and remanded.

VILLANTI and BLACK, JJ., Concur.